**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**Sherdina WILLIAMS, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 9, 2012.
Filed June 24, 2013.

Karl Baker, Public Defender, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: BENDER, DONOHUE and COLVILLE *, JJ.

OPINION BY BENDER, J.:

Sherdina Williams ("Appellant") appeals from the judgment of sentence of 290–580 months' incarceration that was imposed for violations of multiple probations after subsequent convictions in unrelated matters. Appellant challenges the discretionary aspects of her sentence and also argues that the trial court judge should have recused himself due to the appearance of bias. After careful review, we vacate the judgment of sentence and remand for resentencing.

On October 15, 2001, Appellant entered an open plea to seven counts of burglary and related offenses. All of the offenses arose out of Appellant's theft of property from several Catholic institutions.[1] The Honorable James J. Fitzgerald (now a member of this Court) sentenced Appellant to concurrent terms of 11 1/2 to 23 months' incarceration and ten years' consecutive probation for each of the seven burglary convictions. Judge Fitzgerald subsequently paroled Appellant to Beacon House, an inpatient program for pregnant and parenting substance abusers at the Episcopal Hospital in Philadelphia.

Appellant did not remain at Beacon House as ordered. On January 16, 2002, just three months after her plea, Appellant was arrested in an incident for which she was subsequently charged with assaulting a police officer with a pair of scissors. On April 19, 2002, before the Honorable Shelia Woods–Skipper, Appellant pleaded guilty to aggravated assault for the incident.[2]

---

* Retired Senior Judge assigned to the Superior Court.

1. At docket number CP–51–CR–0402721–2001, Appellant stole $2,780 from nuns at St. Helena's Convent, and in attempting to flee the scene, she pushed an elderly nun against a wall. N.T., 3/28/01, at 22. At docket number CP–51–CR–0410971–2001, Appellant stole $75 from the Incarnation Rectory. At docket number CP–51–CR–0410991–2001, Appellant was escorted out after she was discovered in residential rooms at Our Lady of Hope Rectory. At docket number CP–51–CR–08081921–2001, Appellant stole, *inter alia,* a car, a gold watch, a camera, and a laptop computer from the St. Francis de Sales Rectory. At docket number CP–51–CR–0801961–2001, Appellant stole $450 from the Nativity BVM Catholic Parish. At docket number CP–51–CR–0802011–2011, Appellant stole $810 from St. Cecelia's Church. And at docket number CP–51–CR–0802221–2001, Appellant stole $1,800 from St. Ann's Convent.

2. In its written opinion pursuant to Pa.R.A.P. 1925(a), the trial court indicates that Judge Woods–Skipper sentenced Appellant to 11 1/2 to 23 months of imprisonment, but also states that Appellant "failed to complete treatment as ordered." Trial Court Opinion, 2/13/12, at 3. The certified record on appeal contains no information to clarify the precise nature of the sentence imposed by Judge Woods–Skipper, other than that Appellant was obviously not in prison in September 2002, as she was arrested for another burglary at that time (as described above).

Just a few months later, on September 7, 2002, police arrested Appellant for breaking into Friends Hospital in Philadelphia.[3] In that incident, Appellant stole $15 from the victim's purse, and pushed the victim and a security guard while attempting to escape. N.T., 9/17/02, at 5–7. After a non-jury trial on January 3, 2003, the Honorable Chris R. Wogan found Appellant guilty of burglary and simple assault and sentenced her to 40–80 months' incarceration and a consecutive term of two years' probation. Later, in consideration of Appellant's motion for reconsideration of sentence, Judge Wogan reduced the term of incarceration to 36–72 months.

Appellant was released from prison in 2009 after having served the maximum term. On January 24, 2010, police arrested Appellant for DUI and for causing an accident leading to personal injury or death. For those crimes, the Honorable Joseph J. O'Neill sentenced Appellant to 3–6 days' incarceration and 2 1/2 years' probation.

On April 3, 2010, Appellant broke into St. Basil's Convent and St. Michael's Ukrainian Catholic Church, both in Montgomery County. The next day, she broke into St. Basil's Convent again. In sum, she stole $85 from the nuns at St. Basil's and was caught in the Rectory at St. Michael's. When caught at St. Basil's on the second day of her crime spree, Appellant possessed a screwdriver, money, and a coin purse. On March 4, 2011, the Honorable Joseph A. Smyth in Montgomery County accepted Appellant's guilty plea to three counts of burglary and sentenced her to an aggregate term of 7–20 years' incarceration.

On June 1, 2011, as a result of Appellant's multiple violations of her probation sentences imposed by Judge Fitzgerald and Judge Wogan, Judge Wogan revoked her probation.[4] On July 20, 2011, Judge Wogan denied a motion for recusal filed by Appellant. After a violation of probation sentencing hearing on September 30, 2011, at which Appellant presented two witnesses (a priest and a psychologist), Judge Wogan sentenced Appellant to an aggregate term of 290–580 months' incarceration (24 years and two months to 48 years, 4 months), to be served consecutively to the term of incarceration of 7–20 years imposed by Judge Smyth in Montgomery County. Judge Wogan denied two timely motions for reconsideration of sentence.

This timely appeal followed in which Appellant raises two issues for consideration:

1. Did not the sentencing court err as a matter of law, abuse its discretion, and violate general sentencing principles when, following a revocation of probation, the [trial] court imposed a sentence of 24 years, 2 months to 48 years, 4 months['] incarceration, where: this sentence was manifestly excessive and unreasonable; far surpassed what was required to protect the public, the complainants, and the community; went well beyond what was necessary to foster [A]ppellant's rehabilitation; and was grossly disproportionate to the crimes[?]

2. Did not the sentencing court err as a matter of law and abuse its discretion when it failed to recuse itself, for any and all of the following reasons: referring to [A]ppellant as a "pathological liar," undermining [Appellant's] right to

---

**3.** For leaving Beacon House and this re-arrest, on September 26, 2002, Judge Fitzgerald revoked Appellant's parole and ordered her to serve the balance of her original sentence of incarceration.

**4.** Because Judge Fitzgerald is now a senior member of this Court, the seven cases previously assigned to him were reassigned to Judge Wogan.

remain silent at the violation of probation hearing, and having the appearance of bias and impropriety through repeated questioning about why [Appellant] targeted only Roman Catholic institutions?

Williams' Brief at 3.

 Appellant's first issue challenges the discretionary aspects of her sentence. Two requirements must be met before we will review such a challenge on its merits.

First, an appellant must set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence. Second, the appellant must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code. The determination of whether a particular issue raises a substantial question is to be evaluated on a case-by-case basis. In order to establish a substantial question, the appellant must show actions by the trial court inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing process.

*Commonwealth v. Ferguson*, 893 A.2d 735, 737 (Pa.Super.2006) (quoting *Commonwealth v. McAfee*, 849 A.2d 270, 274 (Pa.Super.2004)).[5]

 Appellant has included in her appellate brief a statement of reasons in support of review of the discretionary aspects of the sentence. In asserting that the trial court imposed a sentence unreasonably disproportionate to her crimes and unduly excessive, Williams has provided plausible arguments that her sentence is "contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Mouzon*, 571 Pa. 419, 812 A.2d 617, 622 (2002) (plurality) (opining that an appellant raises a substantial question when she "sufficiently articulates the manner in which the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process"); *see also Ferguson*, 893 A.2d at 737 (reaffirming that a claim that sentence was manifestly excessive presents a substantial question). As Appellant has satisfied this requirement, we proceed to review her claim on its merits.

 The imposition of sentence is vested in the discretion of the trial court, and should not be disturbed on appeal for a mere error of judgment but only for an abuse of discretion and a showing that a sentence was manifestly unreasonable. *Commonwealth v. Walls*, 592 Pa. 557, 926 A.2d 957, 961 (2007).

The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Ward*, 524 Pa. 48, 568 A.2d 1242, 1243 (1990); *see also Commonwealth v. Jones*, 418 Pa.Super. 93, 613 A.2d 587, 591 (1992) (*en banc*) (offering that the sentencing

---

5. In earlier cases, this Court stated that "[t]he scope of review in an appeal following a sentence imposed after probation revocation is limited to the validity of the revocation proceedings and the legality of the judgment of sentence." *See, e.g., Commonwealth v. Infante*, 850 A.2d 696, 697–98 (Pa.Super.2004). In *Ferguson*, however, we recognized that this was too narrow of a statement of our scope of review, and that our scope of review permits us to consider challenges to the discretionary aspects of an appellant's sentence in an appeal following a revocation of probation. *Ferguson*, 893 A.2d at 737 (citing *Commonwealth v. Sierra*, 752 A.2d 910, 913 n. 6 (Pa.Super.2000)).

court is in a superior position to "view the defendant's character, displays of remorse, defiance or indifference and the overall effect and nature of the crime."). Simply stated, the sentencing court sentences flesh-and-blood defendants and the nuances of sentencing decisions are difficult to gauge from the cold transcript used upon appellate review. Moreover, the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise, experience, and judgment that should not be lightly disturbed.

*Walls,* 926 A.2d at 961.

■■■ The proper standard of review for an appellate court is to focus on the pertinent statutory provisions in the Sentencing Code, specifically 42 Pa.C.S. § 9781(c) and (d), and 42 Pa.C.S. § 9721(b). *Id.* at 963. We also consider a sentence imposed following revocation of probation in light of the limitations set forth in 42 Pa.C.S. § 9771(c).[6] Because subsections 9781(c) and (d) include a focus on sentencing guidelines, however, and because sentencing guidelines do not apply to sentences imposed following a revocation of probation, in this case we look solely to the provisions of 42 Pa.C.S. § 9721(b). *Commonwealth v. Coolbaugh,* 770 A.2d 788, 792 (Pa.Super.2001). Section 9721(b) provides in pertinent part as follows:

> [T]he court shall follow the general principle that the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

42 Pa.C.S. § 9721(b).

In order to establish that the sentencing court abused its discretion, Appellant "must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." *Commonwealth v. Rodda,* 723 A.2d 212, 214 (Pa.Super.1999) (*en banc* ) (quotation marks and citations omitted). *See also Walls,* 926 A.2d at 961 (citation omitted) ("An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice[,] bias or ill-will, or such a lack of support as to be clearly erroneous.").

On its face, the trial court's Pa.R.A.P. 1925(a) opinion addresses each of the three pertinent factors set forth in 42 Pa.C.S. § 9721(b). Based upon Appellant's history of recidivism and her repeated failures to take advantage of drug and alcohol programs (both inside and outside of prison), the court found that Appellant had "zero potential for rehabilitation." Trial Court Opinion (TCO), 2/13/12, at 10, 15–17. The trial court also determined that Appellant is a "profound danger" whose crimes had a "terrible impact on the hospitality and ability to perform charitable works of the Catholic churches she victimized, which

---

**6.** The following limitations apply when a sentence of total confinement is being considered following revocation of probation:

> **(c) Limitation on sentence of total confinement.**—The court shall not impose a sentence of total confinement upon revocation unless it finds that:
> (1) the defendant has been convicted of another crime; or
> (2) the conduct of the defendant indicates that it is likely that he will commit another crime if he is not imprisoned; or
> (3) such a sentence is essential to vindicate the authority of the court.

42 Pa.C.S. § 9771(c).

detrimentally impacts the communities around the churches." *Id.* at 10. In reaching the sentence, the trial court reviewed three pre-sentence investigation reports (dated 9/22/01, 2/5/03, and 7/20/11), two mental health evaluations (MHEs) (dated 10/2/01 and 7/20/11), the testimony of two witnesses called by Appellant to testify on her behalf, Father Thomas Betz and Dr. Gillian Blair (a licensed psychologist), and the arguments of counsel.

■ Generally, our review of a sentence is limited in these circumstances to whether the sentencing court explicitly or implicitly considered the section 9721(b) factors, and we may not re-weigh the significance placed on each factor by the sentencing judge. *See Walls,* 926 A.2d at 964, 966. Given such a deferential standard of review, our Supreme Court recognized that "rejection of a sentencing court's imposition of sentence on unreasonableness grounds would occur infrequently[.]" *Id.* at 964. Nevertheless, we reject the imposition of sentence in this case on two distinct grounds. First, we find the sentence manifestly excessive in the specific circumstances of this case and therefore an abuse of discretion. Second, we reject the sentence because the sentencing court's reasoning is infused with "partiality, prejudice, bias or ill will." *Rodda,* 723 A.2d at 214; *accord Walls,* 926 A.2d at 961.

■ Appellant's sentence of 290–580 months' incarceration (roughly 24–48 years) is severe on its face. It was imposed for conduct that occurred a decade prior to the sentencing hearing and was ordered to run consecutively to the already severe sentence imposed in Montgomery County of 7–20 years' incarceration. Thus, as a result of this sentence, Appellant will not be eligible for parole for more than 31 years, and is subject to a maximum term of more than 68 years' incarceration. Appellant was 30 years old at the time her brief was filed. While such a sentence is not, strictly speaking, a life sentence, the chance that Appellant will survive until the maximum term is expired is negligible at best.

■ Section 9721(b) constrains a sentencing court's discretion in that it requires that any sentence imposed be "*consistent with* the protection of the public, the gravity of the offense[,] ... and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b) (emphasis added). A sentence that disproportionally punishes a defendant in excess of what is necessary to achieve consistency with the section 9721(b) factors violates the express terms of 42 Pa.C.S. § 9721(b), as would a sentence that is disproportionately lenient. Certainly consistency with section 9721(b) factors does not require strict proportionality in sentencing, and the non-quantifiable nature of the factors considered would not permit such a rule in any event. However, a sentence that is clearly and excessively disproportionate is, by definition, inconsistent with "the protection of the public, the gravity of the offense[,] ... and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b).

Given the fundamental principle of proportionality and the severity of the sanction imposed in this case, we expect the conduct for which Appellant was being sanctioned to be proportionally severe. By any measure employed by civilized society, the severity of Appellant's sentence was disproportional to her conduct. In the cases before us, Appellant entered and stole property from several Catholic institutions, and on two of seven occasions, she shoved those who caught her red-handed as she attempted to escape. We do not dispute the characterization of burglary and simple assault as being crimes of violence, but we must also recognize that not all crimes of violence are created equal.

Burglary is not comparable to rape, nor is simple assault on par with murder. Yet here, the trial court has imposed a sentence that is comparable to the sanctions levied for such crimes by invocation of the common categorization applied to all such crimes as being 'violent.' This is error.

In *Walls*, the defendant "pled guilty to one count of rape of a victim less than thirteen years old, 18 Pa.C.S. § 3121(6); one count of involuntary deviate sexual intercourse (IDSI) with a victim less than thirteen years old, 18 Pa.C.S. § 3123(a)(6); and one count of incest" where the defendant had repeatedly sexually molested his seven-year-old granddaughter. *Walls*, 926 A.2d at 959. For those crimes, the sentencing court imposed an aggregate sentence of 21–50 years' incarceration. *Id.*

Here, Appellant was convicted for stealing a few thousand dollars in cash and property over the course of a spree of seven burglaries. Appellant secured entry into the facilities that she burglarized in a non-violent manner. No evidence demonstrated that Appellant ever used or even possessed a weapon during these crimes. And although Appellant did use some physical force while fleeing on two occasions, she did not cause or seriously risk causing serious bodily injury. While not trivial, the gravity of Appellant's crimes are simply not of the same order of magnitude as those reviewed in *Walls*, and yet Appellant was sentenced to a longer minimum term of incarceration. While we acknowledge that a direct comparative analysis to the sentence imposed in *Walls* is not controlling on our review of Appellant's sentence, it is illustrative of its disproportionate nature. Appellant's sentence does not reflect, by several orders of magnitude, the severity and nature of her offenses.

To be fair, Appellant's sentence was not strictly based upon the conduct that gave rise to her convictions at issue in this case. Appellant's sentence largely stems from her inability to rehabilitate in the decade that followed her initial sentence. As the trial court explained, it took Appellant's "eight violations of probation" into account, including the fact that Appellant continued to burglarize after repeated attempts by the courts of this Commonwealth to allow her the opportunity to reform. TCO at 17. The trial court found, therefore, that "a longer sentence is needed to protect the public" from Appellant's recidivism. *Id.* at 17–18.

The excessiveness of Appellant's sentence, however, does not indicate that the trial court erred merely by increasing the duration of the underlying sentence. We agree that Appellant's recidivism required an escalation of sanctions. The issue is one of proportionality. That principle does not undermine the sound reasoning that escalating penalties are required to deter recidivism, but instead strengthens it by preventing unreasonable interpretations that undermine public confidence in the criminal justice system as a whole. Tolerance of such incongruities on the grounds of appellate deference to trial court discretion undermines our commitment to individualized sentences, and renders the noble penological goal of sentence individualization indistinguishable from arbitrary justice.

Our rejection of the sentence imposed in this case does not require a new rule or a new interpretation of the binding precedent clarified in *Walls*. *Walls* recognized that although such events should occur infrequently, the appellate courts retain the authority to reject a sentence as unreasonable and/or excessive (which, we add, are related inquiries). *Walls*, 926 A.2d at 964. We conclude that this is such a case. Appellant's sentence was not unreasonable because of the particular

weight afforded to each circumstance as they relate to relevant section 9721(b) factors, but instead because the resulting sentence was patently disproportionate and excessive even given the assumption that the trial court's weighing of factors was reasonable.

Consideration of section 9721(b) factors does not mechanically dictate a particular sentence with the certainty expected of a well-established scientific formula. Our procedures and principles of sentencing are reliant upon the reasonableness of our jurists in both applying the facts of the case to the relevant factors set forth in section 9721(b), *and* in translating that analysis, rationally and fairly, into an individualized sentence. It is with the latter step that we conclude the trial court abused its discretion. The sentence imposed was unreasonable in its application of the principle of proportionality and, therefore, it was manifestly excessive.[7]

Appellant's sentence also constitutes an abuse of discretion because it was the product of "partiality, prejudice, bias or ill will[.]" *Rodda,* 723 A.2d at 214. Viewed collectively, the trial court's Rule 1925(a) opinion, its statements at the sentencing hearing, and its statements made during prior proceedings in this case, strike a tone of advocacy rather than dispassionate reflection. This accumulation of inappropriate remarks leads us to conclude that Appellant's sentence cannot be divorced from the appearance of bias.

"The sentencing decision is of paramount importance in our criminal justice system," and must be adjudicated by a fair and unbiased judge. *Commonwealth v. Knighton,* 490 Pa. 16, 21, 415 A.2d 9 (1980). This means, a jurist who "assess[es] the case in an impartial manner, free of personal bias or interest in the outcome." *Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 89 (1998). Because of the tremendous discretion a judge has when sentencing, "a defendant is entitled to sentencing by a judge whose impartiality cannot reasonably be questioned." *Commonwealth v. Darush,* 501 Pa. 15, 459 A.2d 727, 732 (1983). "A tribunal is either fair or unfair. There is no need to find actual prejudice, but rather, the appearance of prejudice is sufficient to warrant the grant of new proceedings." *In Interest of McFall,* 533 Pa. 24, 617 A.2d 707, 714 (1992)[.]

---

**7.** In her Concurring Statement, Judge Donohue correctly notes that "significant restraints" have been imposed on this Court's review of sentencing claims by our Supreme Court in *Walls* and its progeny, including *Commonwealth v. Perry,* 612 Pa. 557, 32 A.3d 232 (2011). On this point, we do not disagree. We do disagree, however, that *Walls* and *Perry* prohibit the analysis we conducted in this case. In both *Walls* and *Perry,* our Supreme Court reversed this Court due to our failure to give proper deference to the sentencing courts' findings regarding what were and what were not permissible sentencing factors to consider in justifying an upward departure from the sentencing guidelines. We do not, in this instance, dispute the factors cited by the sentencing court in justifying the sentence imposed. Indeed, giving proper deference to the sentencing court, we assume the sentencing court properly weighed the various aggravating and mitigating factors applicable in Appellant's case and, therefore, we do not dispute its conclusion that escalating criminal sanctions were justified based upon that analysis. Nevertheless, we conclude the sentencing court abused its discretion in fulfilling its statutory obligation to ensure Appellant's sentence is "consistent with" those factors, because the sentence imposed was manifestly unreasonable given the correctness of the sentencing court's weighing of § 9721(b) factors. 42 Pa.C.S. § 9721(b); *Walls,* 926 A.2d at 961 (stating that an abuse of discretion may be found when the "judgment exercised was manifestly unreasonable"). Neither *Walls* nor *Perry* prohibits such review.

*Commonwealth v. Druce,* 577 Pa. 581, 848 A.2d 104, 108 (2004).

As noted above, the overwhelming majority of Appellant's probations originated with sentences imposed by Judge Fitzgerald. Significantly, the appearance of bias in this case first materialized during Appellant's violation of probation (VOP) hearing in a critique of Judge Fitzgerald's exercise of discretion in sentencing. The trial court remarked: "Oh, and the sad news for this defendant is Judge Fitzgerald doesn't sit here anymore. He's in Superior Court. So you have a case in my inventory, so his ten cases were assigned to me. So there is no Judge Fitzgerald anymore. It's me on those cases." N.T. VOP Hearing, 6/1/11, at 11. Similar commentary continued throughout the VOP and related sentencing proceedings, with the trial court later commenting that "I'm putting aside professional c[o]urtesy at this point, and we're going to readdress the actions of Judge Fitzgerald with this case." N.T. 9/30/11, at 56. The court went on to assail Judge Fitzgerald's actions at one of Appellant's previous VOP hearings:

> MS. ANDERSON [defense counsel]: Yes, Your Honor. I read the notes of testimony.
>
> THE COURT: Right. And he was ignoring her direct violation in front of Judge Wood-[S]kipper, where she attacked a police officer with scissors and had a felony of the second degree conviction. So she had a direct violation, which Judge Fitzgerald ignored at that so-called revocation hearing, correct?
>
> MS. ANDERSON: I'm not going to agree to his state of mind, Your Honor. He didn't address it.
>
> THE COURT: He didn't address it. All right. We'll say it that way. He didn't address it. All right. And you think that is appropriate?
>
> MS. ANDERSON: I don't have a comment one way or the other.
>
> THE COURT: I have a comment. I am distinguishing myself from my actions in this case from Judge Fitzgerald's. And the reason I'm doing that is because you made it an issue with your motion for recusal.

*Id.* at 56–57.

This theme permeated the proceeding below. The trial court repeatedly suggested, implicitly and explicitly, that Judge Fitzgerald had been unduly lenient with Appellant, and that the trial court was obligated to correct Judge Fitzgerald's 'mistakes.'

The Court reinforced the appearance of bias with repeated emphasis on the fact that the victims of Appellant's crimes were agencies of the Catholic Church. During the VOP hearing, the trial court offered Appellant the opportunity to speak on her own behalf, but truncated her speech with repeated interruptions. *Id.* at 13. After inquiring about the inadequate supervision that was provided by the Philadelphia Probation Department, the trial Judge engaged in the following exchange with Appellant and her attorney:

> THE COURT: We want to be as helpful to Superior Court as we can. You were on probation, whether you knew it or not, you were on my probation. You were on Judge Fitzgerald's. Remember those ten cases?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Yes?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: And by the way, six of those cases, the burglaries, each one of those cases was a Catholic church, wasn't it?
>
> THE DEFENDANT: Yeah.

THE COURT: And one was St. William's, remember that?

THE DEFENDANT: No.

THE COURT: You don't remember that?

THE DEFENDANT: No.

THE COURT: And one was St. Cecelia's.

THE DEFENDANT: No.

THE COURT: You don't remember that?

THE DEFENDANT: No.

THE COURT: You were just looking for Catholic churches and the name of the church didn't matter, right?

THE DEFENDANT: No, when I was—

THE COURT: I know Mr. Corrigan [defense counsel] is telling you not to talk, but you have a right to talk. He can say under his breath that you shouldn't say anything, but you have the right to address me if you want to.

So, you don't remember burglarizing—and you don't remember pushing the nun and hurting the nun? Do you remember that? Why would you remember that? Because you hurt someone, it wasn't you that was hurt, so why would you remember hurting an old, old nun?

But I have a question for you since you decided to talk a little bit. You burglarized St. William's and then you burglarized St. Cecelia's. I'm thinking of the drive up Rising Sun Avenue and there's Oxford Avenue. I'm thinking you pass a Baptist church, a Methodist church, a Presbyterian church, another Baptist church when you make a right on Rhawn to go to St. Cecelia's. I might even be missing a church or two. Let me ask you, why did you pass all those Protestant churches to go from one Catholic church to the next Catholic church further up?

THE DEFENDANT: To be honest, I might have known there was two or three, but a lot of the time I took—

THE COURT: You're not getting my question. You burglarized a Catholic church on Rising Sun Avenue and then you drove by at least four or five or, maybe, six Protestant churches to get to the next Catholic church to burglarize. My question is: What was the matter with the other churches? Why did you just pick out six Catholic churches? Is there a reason you would think of that?

MR. CORRIGAN: They were mostly on different days.

THE COURT: I know that, but you still have to pass those other churches. And your most recent three burglaries in Montgomery County, one was St. Basil's Academy, [a] Catholic institution.

THE DEFENDANT: Yes.

THE COURT: Can you answer, I mean, why Catholic institutions? Do you have a reason? I know Mr. Corrigan keeps telling you not to say anything.

MR. CORRIGAN: I know why. I know what happened for these earlier cases because I pulled them and looked at them, and it's a little bit complicated but I think part of the reason is—

THE COURT: Well, why can't she tell me? Who would know better than her why she picked out Catholic churches?

MR. CORRIGAN: Often, people don't have insight as to why they do things to other people.

THE COURT: Oh, okay, you can find a reason.

MR. CORRIGAN: As Your Honor well knows, Catholic churches tend to be open for business every[ ]day. Catholic churches tend to have mass every[ ]day.

Catholic churches tend to be unlocked because they have mass every[ ]day.

THE COURT: All right. Thank you. I appreciate that.

Ms. Williams, do you agree with that? He's saying that you picked out Catholic churches because they were open.

THE DEFENDANT: I'm scared to talk to you. I'm confused. I don't even know what's going on. No one came to talk to me before this.

THE COURT: All right. Well, I'll tell you what's going on. You're a career burglar. Okay? You're a career burglar. That's what you do and, apparently, most of your burglaries involve Catholic institutions. There's nothing really confusing about that. You've violated probation on seven cases that I have, not Judge Fitzgerald.

*Id.* at 16–20.

At a subsequent hearing held just two weeks later, the trial court's recollection of the above exchange was less than precise. Appellant's newly appointed counsel, Marit Anderson, Esq., was attempting to familiarize herself with Appellant's case by obtaining relevant court documentation including court orders that had already been filed. An issue arose concerning the presentence report that had been ordered, when the following discussion occurred:

THE COURT: We'll sign your order and you can get all the notes you want.

MS. ANDERSON: Thank you very much. There's one other issue with respect to this matter. My understanding is that Your Honor had ordered a presentence investigation in this case and that when the presentence investigator went to speak with Ms. Williams sitting in the subbasement that she wanted to speak with her attorney before doing the presentence investigation. I think that there was some kind of document signed to that effect, and so no presentence has

actually been accomplished, so I just want to make the Court—

THE COURT: That's just a continuation of what happened at the hearing in front of me when she stopped answering my questions because I was catching her in so many lies. That's all that is about. But if she refuses to cooperate with the presentence report so be it.

MS. ANDERSON: Well, my request at this point, Your Honor, is that now that we had a chance to speak with her, that she is willing to cooperate, that that presentence be done.

THE COURT: Why not? Let's give her some more resources. We'll ask presentence to again spend additional time on Ms. Sherdina Williams by attempting once again to talk with her.

MS. ANDERSON: Thank you, Your Honor.

THE COURT: You're quite welcome.

N.T., 6/16/11, at 4–6.

At the first VOP sentencing hearing, the trial court intensely cross-examined a defense witness over Appellant's 'targeting' of Catholic institutions, despite the witness's reluctance to speculate on the matter. N.T., 9/30/11, at 49–52. It appears, however, that the Court attempted to sanitize this line of inquiry as follows:

This is going to be an individualized sentence. It's framed for you alone. I don't have any preconceptions and, frankly, I'll reiterate again, I don't care that you were targeting Catholic rectories and convents. I don't know why you were and I'll never know that, but every church, every rectory, every convent and people in all religions, whether they're Catholics, Protestants, Jews, Muslims or Buddhist[s], they all deserve to be free from serial burglars. So it matters not to me that I happen to be a

Catholic, matter not to me at all. Everybody needs to be protected.

Your secret will go with you. I, frankly, didn't believe you at one of the hearings when you said you didn't remember. You sure as heck remember. You're never going to say it, and you don't have to say it, but it doesn't matter because everybody needs to be protected from the likes of you.

*Id.* at 83–84.

Although Appellant disproportionately burglarized Catholic institutions, there is nothing in the record to indicate that Appellant held a particular animus towards the Catholic Church other than the fact that such institutions presented an easy target. Nevertheless, the trial court repeatedly questioned Appellant and lectured the courtroom on the topic, insinuating that something more sinister lurked beneath the surface of Appellant's ambivalence.

To this end, the trial court insisted on repeatedly describing Appellant as a "pathological liar." TCO at 13; N.T., 7/20/11, 19. Such pseudo-medical terminology suggests a mental abnormality rendering Appellant unable to tell the truth, or that she persistently lies with no rational motive. Use of such terminology without a sufficient scientific evidentiary basis is so incendiary that we have found its use by an assistant district attorney during a trial to constitute prosecutorial misconduct. *See Commonwealth v. Culver*, 51 A.3d 866, 878–79 (Pa.Super.2012).

In its Opinion, the trial court refers to Appellant as a "classic sociopath." TCO at 10. Typically, a sociopath is defined as a person afflicted with anti-social personality disorder, and is used synonymously with the term 'psychopath.'[8] The record reflects that Appellant has potentially treatable mental health and substance abuse issues, whereas the trial court's mischaracterization of Appellant's mental health implicitly substitutes a more dire prognosis for rehabilitation. Nothing in the evidentiary record suggests a diagnosis of anti-social personality disorder, sociopathy, or pathological lying. The use of such pseudo-medical terminology (or the improper use of legitimate medical and/or scientific terminology) infuses speech with unwarranted weight, *i.e.*, bias. If the invocation of such rhetoric is relied upon to serve as the foundation of subsequent conclusions, as it clearly was in this instance, the bias necessarily affects the conclusion. The trial court's description of Appellant as being a "pathological liar" and a "classic sociopath" lacks any support in the record, and that error is not trivial in this instance. The bias it signals cannot be ignored when the trial court premises the imposition of such a severe sentence on the balance between Appellant's "extremely low potential for rehabilitation against the duty to protect the public." TCO at 15–16.

Other comments by the court also suggest the appearance of bias against Appellant based on her gender. During sentencing, the trial court declared:

I can't say among all the men, but I have to say among the women who appeared in front of me, you're number one. You're number one. You will com-

---

**8.** *See* Jon Ronson, *The Psychopath Test: A Journey Through the Madness Industry* 112–13 (2011) ("Psychologists and psychiatrists around the world tend to use the terms [psychopath and sociopath] interchangeably."); *Accord* Ken Levy, *Dangerous Psychopaths: Criminally Responsible but Not Morally Re-* *sponsible, Subject to Criminal Punishment and to Preventive Detention*, 48 San Diego L. Rev. 1299, 1394 (2011). Merriam–Webster defines a sociopath as "a sociopathic individual: psychopath," and a psychopath as "a mentally ill or unstable individual; especially: one having an antisocial personality."

mit another crime as soon as you are no longer imprisoned. It's not just likely, I'm sure of it. I'm sure of it. You're number one amongst the female defendants who have appeared before me in nine-and-a-half years doing this job.

N.T., 9/30/11, at 81–82.

Later, the trial court stated that Appellant was "the most violent, thuggish female who has appeared before me in my nine-and-one-half years." N.T., 9/30/11, at 93. These statements are problematic because they suggest that the trial court is classifying defendants based upon gender and that Appellant is deserving of the harshest of penalties because of the judge's subjective comparison of her situation to other female defendants *that he has sentenced.* This line of reasoning is inappropriate and also demonstrative of bias.

We conclude, therefore, that the overwhelming appearance of bias on the part of the trial court rendered Appellant's sentence an abuse of discretion. The trial court's bias or partiality was demonstrated by its focus on repairing or correcting the perceived mistakes of prior judges with whom the trial judge disagreed and its excessive focus on the Appellant's victimization of the Catholic Church and attribution of motives to Appellant that were unsupported by the record. Also demonstrative of bias or partiality was the use or misuse of pseudo-medical terminology to describe Appellant's mental health that was unsupported by the record, and the improper consideration of Appellant's gender and the court's subjective comparison of Appellant to other members of Appellant's gender that were sentenced in his courtroom. The factors, collectively and individually, demonstrate a strong appearance of bias and partiality. Accordingly, Appellant's sentence constituted an abuse of discretion.

 In Appellant's final issue, she argues that the trial court erred in refusing to recuse itself after calling her a "pathological liar" and inquiring extensively into why she targeted Catholic institutions.

Our Supreme Court presumes that judges of this Commonwealth are "honorable, fair and competent[,]" and vests in each jurist the duty to determine, in the first instance, whether he or she can preside impartially. *Id.* (citing *Commonwealth v. White,* 557 Pa. 408, 734 A.2d 374, 384 (1999)). In the context of criminal sentencing, however, this standard requires that the judge recuse himself not only when he doubts his own ability to preside impartially, but whenever he "believes his impartiality can be reasonably questioned." *Commonwealth v. Lemanski,* 365 Pa.Super. 332, 529 A.2d 1085, 1088–1089 (1987) (quoting *Commonwealth v. Goodman,* 454 Pa. 358, 311 A.2d 652, 654 (1973)). *See also Abu–Jamal,* 720 A.2d at 89; *Commonwealth v. Benchoff,* 700 A.2d 1289, 1294–1295 (Pa.Super.1997) (citing *In the Interest of McFall,* 617 A.2d at 712) ("Because the integrity of the judiciary is compromised by the appearance of impropriety, recusal is necessary where the judge's behavior appears to be biased or prejudicial."). Consequently, "a party arguing for recusal need not prove that the judge's rulings actually prejudiced him; it is enough to prove that the reasonable observer might question the judge's impartiality." *Reilly by Reilly v. Southeastern Pennsylvania Transp. Auth.,* 330 Pa.Super. 420, 479 A.2d 973, 991–993 (1984).

*Commonwealth v. Rhodes,* 990 A.2d 732, 748 (Pa.Super.2009).

 Although we reached the conclusion that the trial court demonstrated bias at the sentencing hearing, we nevertheless

conclude that Appellant has not met her burden of demonstrating bias during the preceding VOP hearing. The recusal motion in this case was filed before the sentencing hearing, and it was premised exclusively upon the trial court's comments made during the VOP hearing. Thus, we conclude, the trial court did not abuse its discretion in denying the recusal motion. Appellant's multiple probation violations were a direct result of her new conviction in Montgomery County. Consequently, the decision to find Appellant in violation of the probations at issue in this case was practically devoid of discretion. In such circumstances, it is hard to conceive of how Appellant could have been prejudiced, even assuming that the proceeding had been tainted by bias or impartiality.

Another deficiency in Appellant's arguments is that Appellant offers examples of bias and partiality that occurred both before *and after* the motion for recusal. In fact, the strongest examples of bias provided by Appellant occurred during sentencing, a hearing that occurred several months after the recusal motion was disposed of by the trial court. We acknowledge Appellant's argument that there was excessive concentration by the trial court at the probation hearing on the issue of Appellant's choice of victims. However, the trial court's line of inquiry did initially appear to logically arise out of Appellant's disproportionate targeting of Catholic institutions, and the trial court's examination of whether Appellant was driven by purely opportunistic or more sinister motivations was not, in isolation, demonstrative of bias or partiality. It was not until that pattern of inquiry continued throughout the course of the subsequent proceedings that the appearance of bias rose to a critical level. Thus, although we conclude that there was ample evidence of bias at the sentencing hearing such as to constitute an abuse of discretion in sentencing, we conclude that

Judge Wogan did not abuse his discretion at the time he refused to recuse himself.

Having concluded that Appellant's sentence constituted an abuse of discretion because it was excessive and the product of bias, we remand this matter for resentencing. Judgment of sentence **VACATED**. Case **REMANDED** for resentencing. Jurisdiction relinquished.

Judge DONOHUE files a concurring statement.

## CONCURRING STATEMENT BY DONOHUE, J.:

I concur in the result reached by the learned Majority, but I cannot join in its reasoning. I agree wholeheartedly that the sentence imposed in this case, 290–580 months of incarceration for probation violations, is clearly excessive. However, because of the significant restraints our Supreme Court has imposed on this Court's review of sentencing claims, *see, e.g., Commonwealth v. Perry*, 612 Pa. 557, 564–65, 32 A.3d 232, 236 (2011); *Commonwealth v. Walls*, 592 Pa. 557, 926 A.2d 957 (2007), I do not think it is within this Court's province to engage in the sort of "proportionality" analysis the Majority has performed in this case. Instead, I would vacate the judgment of sentence because the trial court abused its discretion in sentencing Williams, as the certified record on appeal plainly reflects that the excessive sentence here is the result of the trial judge's partiality, prejudice, bias, and ill-will towards Williams throughout the entire sentencing process.

In *Walls*, the Supreme Court established strict limitations on this Court's ability to reverse the sentencing decisions of trial courts. In particular, in *Walls* the Supreme Court made clear that this Court must show a high degree of deference to the trial court's sentencing determinations,

in large part because the trial court is "in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Id*, at 565, 926 A.2d at 961 (quoting *Commonwealth v. Ward*, 524 Pa. 48, 52, 568 A.2d 1242, 1243 (1990)). Unlike this Court, which conducts appellate review based upon a "cold transcript," the trial court sentences "flesh-and-blood defendants" and is thus best situated to gauge "the nuances of sentencing decisions." *Id*.

Moreover, in *Walls* the Supreme Court made clear that when addressing a claim that a sentence is unreasonable, this Court's statutory authority is limited to determining whether the trial court failed to consider the factors set forth in either of two provisions in the Sentencing Code, specifically 42 Pa.C.S.A. § 9781(c)(3) and 42 Pa.C.S.A. § 9721(b). *Id*, at 567–68, 926 A.2d at 963. With respect to section 9781(c)(3), this Court must ascertain whether a sentence that exceeds the sentencing guidelines is unreasonable based upon the four factors set forth in section 9781(d). *Id*. at 568, 926 A.2d at 963. Sections 9781(c) and (d), however, focus on the proper application of sentencing guidelines, and sentencing guidelines are not utilized in determining the length of sentences imposed following a revocation of probation. *Commonwealth v. Ferguson*, 893 A.2d 735, 739 (Pa.Super.) (citing *Commonwealth v. Coolbaugh*, 770 A.2d 788, 792 (Pa.Super.2001), *appeal denied*, 588 Pa. 788, 906 A.2d 1196 (2006)). Accordingly, section 9781(c)(3) has no application in this case.

Therefore, appellate review of Williams' sentence following the revocation of her probation is guided solely by the provisions of section 9721(b):

> [A] sentence may also be unreasonable if the appellate court finds that the sentence was imposed *without express or implicit consideration* by the sentencing court of the general standards applicable to sentencing found in Section 9721, *i.e.,* the protection of the public; the gravity of the offense in relation to the impact on the victim and the community; and the rehabilitative needs of the defendant. 42 Pa.C.S. § 9721(b).

*Walls*, 592 Pa. at 565, 926 A.2d at 961. Thus, following the revocation of probation, the trial court must impose an individualized sentence after consideration of: (1) the protection of the public, (2) the gravity of the offense in relation to impact on victim and community, and (3) the rehabilitative needs of the defendant. *Id*.

My review of the certified record on appeal indicates that the trial court considered each of the general standards in section 9721(b) when sentencing Williams.[1] Based upon Williams' history of recidivism and her repeated failures to take advantage of drug and alcohol programs (both inside and outside of prison), the trial court found that her prospects for rehabilitation are poor. Trial Court Opinion, 2/13/2012, at 15–17. The trial court also determined that Williams is a threat to society, as she has committed numerous acts of violence, including assaulting nuns and security guards in various burglaries, attacking a police officer with scissors, attempting arson, driving while intoxicated (resulting in an accident), and fighting

---

1. To this end, the trial court reviewed, *inter alia*, three pre-sentence investigation reports (prepared September 22, 2001, February 5, 2003, and July 11, 2011), two mental health evaluations (dated October 2, 2001 and July 20, 2011), the testimony of two witnesses called by Williams to testify in her behalf, Father Thomas Betz and Dr. Gillian Blair (a licensed psychologist), and the arguments of counsel.

while in prison. *Id,* at 13–16. Finally, the trial court determined that Williams' crimes have had considerable negative impacts on her victims and the community in general. *Id,* at 16 & n. 17. The record on appeal supports these findings of the trial court.

Thus, even though in my view the sentence imposed here is clearly excessive, in a case without more, under the strictures of *Walls* our appellate analysis of Williams' sentencing claim would be complete and the result would be an affirmance of the trial court's decision. Pursuant to *Walls,* the trial court did all that was required of it (i.e., consideration of the section 9721(b) factors), and this Court's appellate review confirmed that the trial court had adequately done so and that the record on appeal supported its findings. As such, this Court cannot perform a "proportionality" analysis to evaluate whether the severity of the sentence matches the severity of the crimes.[2] The trial court made the determination of proportionality and this Court is obliged to show it great deference. *Walls,* 592 Pa. at 564, 926 A.2d at 961.

In this case, however, there is more. A trial court's sentence must be vacated if the sentence imposed is the result of the trial judge's "partiality, prejudice, bias or ill-will" towards the defendant. *Id.* Here, the record on appeal demonstrates that the trial judge repeatedly and consistently acted with partiality, prejudice, bias and ill-will towards Williams personally. At a hearing on June 16, 2011, the trial judge claimed that Williams had stopped answering questions at the recent revocation of probation hearing because "I was catching her in so many lies." N.T., 6/16/11, at 5–6. The transcript of the revocation hearing, however, does not reflect that Williams was "caught" telling any lies, and instead shows merely that Williams stopped answering questions after she admitted that she was scared and confused by the trial judge's questions to her about her selection of Catholic institutions to burgle. N.T., 6/1/11, at 19 ("I'm scared to talk to you. I'm confused. I don't even know what is going on. . . .").

Thereafter, apparently based upon these same unsupported accusations of lying at the revocation hearing, the trial judge repeatedly referred to Williams as a "liar" and a "pathological liar." N.T., 6/20/11, at 19; Trial Court Opinion, 2/13/12, at 13 ("Defendant is a pathological liar."). As the Majority correctly notes, the term "pathological liar" suggests that Williams suffers from some mental disease or condition that prevents her from speaking truthfully.[3] The record on appeal, however, contains no evidence that Williams in fact suffers from any such psychological condition—including the evidence received from Dr. Gillian Blair, a licensed psychologist who testified at the sentencing hearing and submitted a written forensic evaluation of Williams' mental condition to the trial court. N.T., 9/30/11, at 24–55. On another occasion, the trial judge described Williams as a "classic sociopath," Trial Court Opinion, 2/13/12, at 10, even though, again, nothing in the record on appeal (including from Dr. Blair or otherwise) implies or suggests that Williams suffers

---

**2.** Upon sentencing following a revocation of probation, the trial court is limited only by the maximum sentence that it could have imposed originally at the time of the probationary sentence. *Commonwealth v. McAfee,* 849 A.2d 270, 275 (Pa.Super.2004).

**3.** In one recent case, this Court described the use of the phrase "pathological liar," particularly in the absence of any record evidence to support it, as "simply out-of-bounds in any courtroom." *Commonwealth v. Culver,* 51 A.3d 866, 878 (Pa.Super.2012).

from any sort of anti-social personality disorder.

At the sentencing hearing on September 30, 2011, the trial judge went even further, stating that Williams was "the most violent, thuggish female who has appeared before me in my nine-and-one-half years" on the bench. N.T., 9/30/11, at 93. Referring to Williams as a "thug" and attempting to rank her "thuggish-ness" in relation to other female defendants appearing before him on prior occasions went well beyond permissible commentary and/or argument at a sentencing hearing. Tossing out such outrageous superlatives at a sentencing hearing amounts to mere name-calling, and is no proper part of a trial judge's proper function in that circumstance—namely to evaluate above-discussed section 9721(b) factors to determine an appropriate individualized sentence for the defendant in question.

In this case, the cumulative effect of the trial judge's statements (including those described both herein and in the Majority opinion) was an unfounded personal attack on Williams. A sentencing judge should not reflect mean-spiritedness, and should instead appear as the fountainhead of justice. This Court has vacated judgments of sentence for similar behavior in prior cases. In *Commonwealth v. Spencer*, 344 Pa.Super. 380, 496 A.2d 1156 (1985), for example, at sentencing the trial judge called the defendant a "punk" and an "animal," and stated that "[i]f there ever was a case where the death penalty should be imposed, I would gladly pull the switch on you, Chief." *Id.* at 1164. This Court concluded that such statements reflected "the sentencing judge's personal prejudice, bias, and ill-will towards appellant," and vacated the judgment of sentence. *Id.*

As in *Spencer*, here the trial judge's incendiary and supercharged language attacking Williams personally demonstrated his partiality, prejudice, bias, and ill-will towards her. I would vacate the judgment of sentence on this basis.[4]

---

4. Because Williams' first issue on appeal is dispositive, I would not address her second issue (relating to recusal).