J-A17023-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| STEVEN PAUL MERTZ | : | |
| | : | |
| Appellant | : | No. 3181 EDA 2022 |

Appeal from the Judgment of Sentence Entered June 28, 2022
In the Court of Common Pleas of Monroe County
Criminal Division at No(s):  CP-45-CR-0002668-2019

BEFORE:   KING, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY SULLIVAN, J.:                **FILED DECEMBER 19, 2023**

Steven Paul Mertz ("Mertz") appeals from the judgment of sentence imposed following his convictions for bribery and obstruction of justice.[1]  We affirm the convictions, but vacate the judgment of sentence and remand for resentencing.

The relevant factual and procedural history of this case is as follows: Trial testimony revealed that in October 2019, the victim in this case, C.B., lived in Sierra View, Pennsylvania, and worked as a bartender at a local bar. **See** N.T., 3/23/22, at 23.  The night of October 15, 2019, following the end of her four-to-ten-p.m. shift at work, C.B. and two friends went to the Tannersville Inn to have a couple of drinks.  **See id**. at 25-26.  That night was

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 4701(a)(3), 5101.

the anniversary of C.B.'s brother's death, and her two friends "came and stopped in, to see how I was and then offered to take me out for some drinks afterwards." *Id*. at 26. C.B. was at the inn until around midnight. *See id*. at 27. Following several drinks, C.B. left and then met one of the two aforementioned friends, and a different friend, at a steakhouse. *See id*. at 28. C.B. and her friends stayed for approximately an hour at the steakhouse and drank wine before leaving around two a.m. *See id*. at 28-29. C.B. left and got into her vehicle to go straight home, when she was stopped by Mertz, then a corporal with the Pocono Mountain Regional Police Department ("PMRPD"). *See id*. at 29-30.

Mertz walked up to C.B.'s car, asked for her information, and returned to his vehicle. *See id*. at 31. Mertz then returned to C.B.'s vehicle and administered a portable breath test ("PBT") on her. *Id*. at 32-33. During the stop, Mertz called for assistance, and Officer Daniel Jones, who was also on the night shift at the time, responded at around 2:20 a.m. *See* N.T., 3/22/22, at 100. Mertz asked Officer Jones to perform field sobriety tests on C.B. Officer Jones administered the tests; C.B. failed them; and Officer Jones consequently concluded C.B. was impaired. *See id*. at 101-02. Mertz took C.B. into custody. *See id*. at 102. He handcuffed C.B. behind her back, searched her incident to arrest, and placed her in the rear of his patrol car. *See id*. at 104-05. Officer Jones did an inventory search of C.B.'s vehicle and found her cell phone and $151, which he gave to Mertz. *See id*. at 105. Officer Jones did not overhear any conversation between C.B. and Mertz. *See*

*id*. at 106. Officer Jones saw Mertz leave with C.B., while he waited with another officer for a tow truck to tow C.B.'s vehicle. *See id*. at 106-07.

Mertz transported C.B. for a breath test, during which the two conversed and C.B. told Mertz about her deceased brother and Mertz told C.B. about a "son" he had recently lost. *See* N.T., 3/23/22, at 37-38. Pennsylvania State Police ("PSP") Trooper Jonathan Hontz was working at the time at Troop N in Fern Ridge. *See* N.T., 3/22/22, at 138. Mertz brought C.B. to the Troop N station at around three a.m. for a chemical/breath test. *See id*. at 142. Trooper Hontz testified that C.B. appeared intoxicated. *See id*. at 145. Trooper Hontz administered the breath test, and C.B. blew a .147. *See id*. at 155. Mertz never asked Trooper Hontz to Live Scan, *i.e.*, digitally fingerprint, C.B, though Trooper Hontz testified that he does perform Live Scans at the request of local police departments such as PMRPD. *See id*. at 145-46.

Trooper Hontz heard C.B. make various remarks to the effect of, "I can't deal with another DUI," and complaining about her car getting towed, as well as about the outstanding warrant. *See id*. at 156. Each time, Mertz responded with, "We're going to figure it out." *See id*. Trooper Hontz related that this made him feel "uncomfortable just because of how many times it was said." *See id*. The whole interaction, including administration of the breath test, took approximately fifteen to twenty minutes, according to the testimony. *See id*. at 149-50.

Mertz and C.B. left the PSP barracks, and Mertz told C.B., "that he was gonna call the judge . . . like [one of] his buddies[,] and he was gonna try to

clear up the whole arrest warrant and he was going to try to . . . figure it out . . .." *See* N.T., 3/23/22, at 40-41. C.B., who was sitting in the back of the police cruiser, heard Mertz talking with a judge. *See id*. at 41. The magistrate judge testified that Mertz told him there was a "Motor Vehicle Code incident, that there was a traffic stop[,] and he told me that when he ran the person[,] it came up as a warrant[,] but an old warrant. And he said that he wanted to release and tell [C.B.] to report to [the other magistrate judge who issued the warrant] at nine o'clock." *Id*. at 125. The magistrate judge accepted Mertz's representation that the warrant was old, C.B. was not a flight risk or danger to the public, and it was the "sort of case that would fall into the category of cases on the lower end of the spectrum." *Id*. at 126. Mertz later authored a narrative in which he asserted he told the magistrate the charge and grading for the prior offense for which C.B. had a warrant; the magistrate disputed this account, and recollected Mertz did not tell him the prior offense was a felony DUI. *See id*. at 129. Mertz also did not tell the magistrate that the present motor vehicle offense was a DUI. *See id*. at 126. Had Mertz told the magistrate that the offense was a DUI, the magistrate would have wanted the suspect "brought over to the jail and I would make a decision based on the facts and circumstances of the case . . .." *Id*. at 127.

After Mertz completed the call, he informed C.B. that he did not have to take her to jail, but that she could go home, and talk to the judge about the warrant in the morning. *See id*. at 42. Mertz drove C.B. back to her house. *See id*. at 42-43. They pulled into the front of the driveway, and Mertz got

out of the car, opened C.B.'s door, and asked her if her mom was home; C.B. told him yes and that her mom was probably awake. *See id*. at 43. C.B. tried to "scoot out" of the door, but Mertz "was just standing there," and he said, "[W]e should probably go somewhere else . . .." *Id*. at 44. C.B. was scared and "knew something was about to happen," and Mertz, after just "standing there," blocking her exit from the door, closed the door. *Id*. at 44-45. Mertz drove the patrol vehicle down the road to a cul-de-sac, parked the vehicle under a streetlight, opened C.B.'s door, and just stood there. *See id*. at 45-46. After Mertz stared at C.B., she asked him, "[W]ould you like me to suck your dick?" *Id*. at 47. Mertz replied, "That would help." *Id*. Mertz then turned her around, pulled a condom out of his pocket, put it on, and then penetrated C.B. *See id*. at 49. After he finished, Mertz took the condom off and put it in his pocket. *See id*. at 51.

Mertz then drove C.B. back to her house, let her out of the vehicle, and gave C.B. a card with the magistrate judge's name on it and told her where to report that day. *See id*. at 53. The business card had Mertz's Google phone number associated with his work phone. *See* N.T., 3/25/22, at 84, 89; *see also* N.T., 3/24/22, at 63 (testimony that C.B.'s phone contained the Google phone number for Mertz). "Right after" C.B. got home, she called her friend Georgia Wolbert ("Wolbert") and reported what happened. *See* N.T., 3/23/22, at 54. Wolbert testified that C.B. related that "she was offered to make everything go away . . .. And then she was offered to give oral sex to the police officer . . .. And then it was taken to another level . . .. He asked

her to turn around and then he proceeded to have intercourse with her." *Id*. at 113. C.B. asked Wolbert to consult with her father. Wolbert's father is a retired detective, and C.B. wanted to know how to proceed "hypothetically." *See id*. at 114. Once Wolbert told her father about the situation, he discerned C.B.'s identity and directly referred the matter to Detective Wendy Serfass. *See id*. at 56-57, 115-16; *see also* N.T., 3/22/22, at 185.

Mertz testified at trial that he received oral sex from C.B. and they had vaginal intercourse, but that it occurred while he was off-duty, and it was consensual and not in exchange for declining to charge C.B. for the DUI. *See* N.T., 3/25/22, at 124-25. According to Mertz, C.B. asked to give him oral sex and then offered vaginal sex after she became "more relieved, more relaxed, [and] more talkative," after learning she would not be immediately transported to jail. *See id*. at 67, 77-79, 84-85. Mertz confirmed he wore a condom, and that he kept them in his "bag for personal use" and also to distribute to teens to encourage them to have safe sex. *See id*. at 80-81. Mertz also confirmed he took the condom back and put it in his pocket. *See id*. at 83. Mertz conceded that it was not normal for him to have sex and then put a used condom in his pocket, but that is what he did in this case. *See id*. at 136.

Mertz and C.B. exchanged several text messages that were entered into evidence at trial, in which Mertz, among other things, assured C.B. she would not be getting a DUI charge. *See*, *e.g.*, N.T., 3/24/22, Ex. C-40. Mertz admitted that he knew he needed to file charges against C.B., but he texted

her, "You're not getting a DUI, relax," because he wanted to string her along so they would continue their relationship. ***See*** N.T., 3/25/22, at 91-92. He also text messaged her, "Yes, I'm sure, positive," in response to her query that, "[Y]ou're a thousand percent sure I'm not getting a DUI from last night[?]" ***Id***. at 97. ***See also id***. at 143 (Mertz stating that he told C.B. he would get rid of the DUI charges so he could continue to have sex with her). Mertz also offered C.B. money to get her car out of the impound lot. ***See id***. at 99-100. Mertz, additionally, told C.B., "I do my report and it gets lost among all my other reports. ***As long as I didn't get you fingerprinted, which I didn't, it's all good***." ***See id***. at 102 (emphasis added).[2] Mertz later explained he was lying to C.B., again, because he was "stringing her along." ***Id***. at 103. Mertz also explained that he was going to meet with C.B. and let her know that "we had our fling, but I needed, as my job . . . to file those charges and get those charges taken care of. They were not going away." ***Id***. at 106. However, Mertz did not get the chance because he was suspended when he reported for work the next night. ***See id***. at 107. Mertz opined that while he was aware there could be "departmental consequences for his actions," he did not believe there could be "criminal consequences" because, "I didn't do anything wrong. I mean, an affair." ***Id***. at 113.

The Commonwealth later charged Mertz with several offenses, including, as noted above, bribery, a third-degree felony, and obstruction of justice, a

---

[2] ***See also*** N.T., 3/24/22, at 9 (additional testimony that Mertz sent a message to this effect to C.B.).

second-degree misdemeanor. ***See*** Information, 12/18/19.[3] Mertz filed an omnibus pre-trial motion in which he sought, *inter alia*, suppression of his cell phone because it was allegedly seized illegally, and, also, suppression of the fruits of the search of his "duty bag" because the warrant was stale and because of defects in the chain of custody. ***See*** Omnibus Pretrial Motion, 5/5/20, unnumbered at 3-6. The trial court held a hearing on Mertz's motion, the testimony of which the court summarized as follows:

> The next day, [following the events at issue, as set forth above, Mertz] was scheduled to report to PMRPD for a shift. He was instead met for a[n investigative] hearing [pursuant to ***National Labor Relations Board v. J. Weingarten, Inc.***, 420 U.S. 251 (1975)—where due process rights attach, and which is required, following suspicions of misconduct, prior to disciplinary actions— which was held] by PMRPD lieutenants Chris Vogt and Steve Williams, the police chief[,] Christopher Wagner of PMRPD, and [] union counsel. Although the allegations were known to PMRPD, [Mertz] had not yet been charged and was not under arrest at the time of the hearing, or told he was not free to leave, making it simply an administrative hearing pursuant to the department's internal procedures.

> [Mertz,] upon appearing[,] was informed an investigation had begun and that his cell phones, one personal and one departmental property, and firearms would be seized. PMRPD secured the phones for preservation of evidence. A concern arose that "the phones, being cell phones, could be easily tampered with, taken, thrown away, damaged, wiped." . . . The potential evidence contained in these phones was deemed "volatile."

---

[3] The Information also charged rape by threat of forcible compulsion (F1), sexual assault (F2), criminal coercion by official action (M1), two counts of aggravated indecent assault by threat of forcible compulsion (F2), two counts of indecent assault by threat of forcible compulsion (M1), official oppression (M2), involuntary deviate sexual intercourse by threat of forcible compulsion (F1), and sexual assault (F2). ***See*** 18 Pa.C.S.A. §§ 3121(a)(2), 3124.1, 2906(a)(4), 3125(a)(3), 3126(a)(3), 5301(1), 3123(a)(2), 3124.1.

Further, Detective Serfass had learned by examination of [C.B.'s] phone that the two had communicated by a third-party messaging app, and deleting a third-party app by the phone's normal capability usually deletes all content associated with it. Upon seizure, they wrapped the phones in aluminum foil to make them inaccessible to the cellular networks or WiFi. They did not have a search warrant for either phone at the time of seizure. Nor did anyone seek [Mertz's] consent. [Mertz] acquiesced when directed to turn them over but did not express any agreement in the matter. He testified he never consented.

By the time Detective Serfass finished interviewing [C.B.], downloading the content from her phone, and reviewing her communications, it was "well past the normal business hours" for making a warrant application. Based on [Mertz's] position in law enforcement, she found it imprudent to obtain a warrant from a magistrate and instead sought a sealed warrant from a judge of the Court of Common Pleas the next day. However, [Mertz] was still on his way to the *Weingarten* hearing, and she believed the phones needed to be immediately secured as he was likely to appreciate their evidentiary value once he was confronted with the accusations. She did, in fact, get the sealed warrant the next day. [Mertz's] personal phone was not examined after being taken until the warrant was issued.

[Mertz] was placed on administrative leave at the *Weingarten* hearing and went home. Chief Wagner instructed Lieutenant Vogt to obtain [Mertz's] personal things from his locker and desk and make arrangements for their return. As part of the job, since he had been an officer for approximately 22 or 23 years by Lieutenant Vogt's recollection, he would have received such departmental-issue property as handcuffs, a radio, uniform, utility belts, weapons, ammunition, and clips. He would have possessed many things, "from uniforms to duty gear," as well as specialized equipment as part of [Mertz's] role in the SWAT team and other special assignments. The department requires a person to return this equipment on their departure. But it would still be usual for an officer to keep personal items mixed in with those belonging to the PMRPD, and it is not always easy to separate the two. The witness made arrangements for the orderly return of [Mertz's] property. He gathered things from [Mertz's] locker and desk area and had Lieutenant Steve Williams take them to [Mertz]. The customary practice would be to inventory personal property

before returning it, and [Mertz] did, in fact, claim not to have received all his personal items.

PMRPD promoted Corporal Jeff Papi to replace [Mertz]. Corporal Papi came to the supervisor's desk, newly assigned to him after [Mertz] used it, and plugged in chargers for his flashlight and portable radio. Doing so, Corporal Papi found a bag under the desk and knew it belonged to [Mertz], from personal knowledge and a name plate. It is unknown why the bag would have remained there after the rest of [Mertz's] property was returned. It is unknown what, if anything, happened to it in the intervening time or how long it sat there. Potentially, anyone inside the building could access the areas around the desk, and from there the bag itself.

Corporal Papi opened the bag immediately upon finding it and discovered condoms inside. He did not attempt to get a warrant before doing so. After suspecting this had potential evidentiary value, he did not take it to an evidence custodian or assign it an identification number. Nothing further was done by him with it, and it was left where it laid. It sat there unmonitored until the next day, when it was formally logged and secured until a search warrant was issued. The normal policy states that evidence should be collected, identified by a number, and stored in a secure location in the evidence room. As soon as Detective Serfass learned about the bag the next day, she obtained a search warrant.

. . . To track an arrest on the way to prosecution or some other disposition, an arresting officer completes an incident report form. This form would be registered in a computer database, where it is indexed permanently with a unique number. Only a "very limited number of people" in PMRPD can modify or delete a record once created. For an officer to have that incident removed from the system would require going to one of the small number of administrative personnel who have the credentials to do so and explaining the reason that they wish to have it removed. Even if [Mertz] did not create a report, the backup officer Dan Jones, who administered standard field sobriety tests to [C.B.], would have expected one in order to contribute a supplemental with what he needed to report. Once generated, supervisors review and approve each report and regularly query a database for unapproved reports as part of their duty. Once this report exists, it would have been seen by someone above [Mertz], whether he

- 10 -

intended that or not. It was generally practiced that an incident cannot be closed without arrest unless signed off by a supervisor. Further, [Mertz] was placed on administrative leave and resigned before he had the opportunity to modify or delete the report of [C.B.'s] arrest.

Trial Court Opinion, 3/17/21, at 5-9 (citations to the record, and some quotations and brackets, omitted). The trial court ultimately denied Mertz's motion. *See generally* Opinion and Order, 3/17/21. Mertz moved for reconsideration, and the trial court denied the motion. *See* Motion for Reconsideration, 3/26/21; *see also* Opinion and Order, 4/16/21.

The case proceeded to trial, after which, the jury convicted Mertz of bribery and obstruction of justice, but acquitted him on the remaining charges. *See* N.T., 3/28/22, at 153-55. The court held a sentencing hearing in June, 2022. The sentencing guidelines showed that Mertz had a prior record score of zero, and provided that, for bribery, the standard range was restorative sanctions to nine months of incarceration, and the aggravated range was up to twelve months' imprisonment. *See* Guidelines, 11/29/22. The guidelines for obstruction of justice provided restorative sanctions to one month of incarceration in the standard range, and, in the aggravated range, up to four months of incarceration. *See id*. The trial court imposed a sentence of, *inter alia*, thirty to sixty months of incarceration for the bribery conviction, which is **two-and-a-half** times the aggravated range of the guidelines, and two years of probation for the obstruction of justice conviction. *See* N.T., 6/23/22, at 47-48.

Following sentencing, Mertz filed a post-sentence motion wherein he asserted, among other things: there was an alleged disclosure to the Commonwealth of the substance of his *Weingarten* meeting, which he alleged the Commonwealth had not turned over to him; the Commonwealth failed to disclose a statement by a confidential informant; and a challenge to the discretionary aspects of his sentence. *See generally* Motion for Reconsideration, 6/30/22. The trial court held a hearing on the motion, at which Lieutenant Vogt, Chief Wagner, and Detective Serfass testified. *See* N.T., 9/23/22. The court ultimately denied the motion in November 2022. *See* Opinion and Order, 11/23/22. Mertz timely appealed. *See* Notice of Appeal, 12/9/22. Both Mertz and the trial court complied with Pa.R.A.P. 1925.[4]

Mertz raises the following issues for our review:

1. Should the evidence obtained from Mertz's personal cellular telephone and duffel bag be suppressed?

2. Should the purported evidence be suppressed because of staleness?

3. Should the purported evidence be suppressed because of a broken chain of custody?

---

[4] The trial court issued a statement in which it indicated where in the record the reasons for its orders may be found. *See* Trial Court Opinion, 1/20/23, at 3. We note with disapproval that the Commonwealth failed to file a timely appellate brief in this matter.

4. Should the purported evidence be suppressed because of prosecutorial misconduct?

5. Should the Court dismiss the charges because of **Brady**[5] and discovery violations?

6. Should the Court find that evidentiary errors at the time of trial denied Mertz a fair trial?

7. Should the charges be dismissed because of impossibility in that [Mertz] is not charged with an inchoate crime?

8. Should the Court remand for a new sentencing hearing because the trial court improperly departed from the guidelines?

9. Did the trial court abuse its discretion and/or commit an error of law in denying Mertz's requests for bail pending appeal where he is entitled to a bail determination on the record under Pa.R.Crim.P. 521(b).

Mertz's Brief at 6-7 (issues re-ordered for ease of disposition).

In his first four issues, Mertz raises challenges to the order denying his suppression motion. Our standard of review for suppression matters is as follows:

> Our review is limited to determining whether the record supports the findings of fact of the suppression court and whether the legal conclusions drawn from those findings are correct. We are bound by the factual findings of the suppression court, which are supported by the record, but we are not bound by the suppression court's legal rulings, which we review *de novo.*

**Commonwealth v. Mendoza**, 287 A.3d 457, 462 (Pa. Super. 2022) (internal citation omitted). The scope of review for the denial of a motion to suppress "is to consider only the evidence of the Commonwealth and so much of the

---

[5] **Brady v. Maryland**, 373 U.S. 83 (1963).

evidence for the defense as remains uncontradicted when read in the context of the suppression record as a whole." ***Commonwealth v. Jones-Williams***, 279 A.3d 508, 515 (Pa. 2022), *cert. denied sub nom.* ***Pennsylvania v. Jones-Williams***, 143 S. Ct. 525 (2022) (internal citation and quotations omitted).

In his first issue, Mertz argues the trial court erred in denying his motion to suppress his cell phone and duty bag (aka his "duffel bag") because, he asserts, they were seized without a warrant in violation of the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. ***See***, ***e.g.***, Mertz's Brief at 32. It is well-settled that the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures. ***See Jones-Williams***, 279 A.3d at 515. A search or seizure conducted without a warrant is presumptively unreasonable, subject to a few specifically established, well-delineated exceptions. ***See id***.

One such exception to the warrant requirement is for exigency. Our Supreme Court has set forth the general principle for exigency as follows:

> . . . [T]he ultimate touchstone of the Fourth Amendment is reasonableness. The very reason the exigency exception exists is to allow prompt action by law enforcement when the totality of the circumstances establish that it was reasonable to act without a warrant. Thus, the exigency exception applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable . . ..

*Id*. at 517 (internal citations and quotations omitted).  Exigent circumstances may arise where there is "a likelihood that evidence will be destroyed if police take the time to obtain a warrant."  *Id*. (internal citation, quotations, and brackets omitted). ***See also Commonwealth v. Lopez***, 612 A.2d 520, 522-23 (Pa. Super. 1992) (concluding exigent circumstances existed for police to enter a house without a warrant where the officers believed the suspect ran into a house, having observed police, in order to warn others who would destroy or remove "critical evidence from the premises"); ***Commonwealth v. Peterson***, 596 A.2d 172, 179 (Pa. Super. 1991) (noting that "[e]xigent circumstances can be generated when evidence sought to be preserved is likely to be destroyed or secreted from investigation . . ..").

Additionally, should the trial court make an erroneous suppression ruling, this Court need not reverse if the error is harmless.  ***See***, ***e.g.***, ***Commonwealth v. Baez***, 720 A.2d 711, 720 (Pa. 1998).  Harmless error exists where:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Jacoby***, 170 A.3d 1065, 1085–86 (Pa. 2017).

Mertz argues the Commonwealth illegally seized his personal cell phone without a warrant, and so any evidence obtained therefrom should have been

- 15 -

suppressed. *See* Mertz's Brief at 31. Mertz maintains he was not under arrest at the time his phone was seized, so it was not a search incident to arrest. *See id*. at 33. Additionally, he did not consent to the seizure. *See id*. Mertz further asserts there were no exigent circumstances requiring seizure of his phone without a warrant because it would have only been "inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate." *See id*. at 37. Regarding the phone, Mertz lastly and baldly asserts there was no probable cause to issue a search warrant. *See id*. While the bulk of Mertz's argument is devoted to the seizure of his phone, he also argues his bag was unlawfully seized without his consent and without a warrant. *See id*. at 31-32.

The trial court considered Mertz's assertions of error and concluded they merit no relief:

> Based on the same reasoning above, we find the temporarily-warrantless seizure reasonable under the exception for exigent circumstances. [C.B.'s] statements provide a person of reasonable caution with cause to believe crimes occurred relating to the extortion of sexual favors in return for criminal leniency. From the messages recovered from [C.B.'s] phone, that person of reasonable caution would expect to find those and potentially other messages on the sender's device. As above, once [Mertz] would become aware of the allegations, good reasons existed to anticipate that he could quickly destroy the evidence sought. It was therefore exigent to remove the devices from his control at the time he would learn of the accusations against him. This preemptive seizure was also limited to a reasonable amount of time required for issuance of a sealed warrant, the necessity of which has been accepted above. We find the seizure permissible.

\* \* \* \*

- 16 -

[Mertz] contends that PMRPD seized his personal duffel bag, otherwise referred to as his "patrol bag" or "duty bag," and its contents, again without a warrant. [Mertz] left the bag at his workstation when he was placed on administrative leave before ultimately resigning. He believes PMRPD seized it by denying him an opportunity to remove his personal items on that day, particularly when the nameplate on the bag personally identified it as his. However, the Commonwealth presented evidence that it simply went undiscovered for some time while it remained under a desk. Testimony from those who delivered other personal effects to [Mertz] showed they overlooked this item or never knew of it. Nothing suggests anyone ordered, forced, or deceived [Mertz] in order for him to surrender it or deliberately concealed it from him. We therefore conclude that PMRPD did not seize the bag and its contents but simply found it in its offices.

Trial Court Opinion, 3/17/21, at 12-13, 14.

Following our review, we conclude the trial court's findings are supported by the record and its conclusions of law error-free. Initially, as Mertz concedes, officers seized his personal phone but did not search it until after the issuance of a search warrant. The trial court noted that Mertz was aware of the allegations against him and that evidence, namely messages to and from C.B., were likely to be on his phone and that it would be easy to erase, even remotely, because the text app Mertz used to communicate with C.B. was a third-party app, meaning that it could be altered "without it even being in your presence," thereby making the evidence, as Detective Serfass opined, "very volatile." *See* N.T., 10/2/22, at 128. The trial court credited this testimony and concluded the seizure was necessary in order to prevent the destruction of evidence. This determination was not an error of law. *See*

*Lopez*, 612 A.2d at 522-23; *see also Peterson*, 596 A.at 179.[6]  Further, the trial court concluded that Mertz's bag was not seized, but rather inadvertently left under his desk until officers later discovered it.  *See*, *e.g.*, N.T., 10/2/20, at 49-50, 91, 99, 103.[7]

In his second issue, Mertz argues the trial court erred in denying his motion for suppression of his duty bag and the evidence therein (namely, the

---

[6] We note it is uncertain what evidence Mertz is seeking to have suppressed as a result of the seizure of his personal phone.  In the end, the number on the back of the card that Mertz gave C.B. was for a Google voice app linked to Mertz's **department-issued** cell phone.  *See* N.T., 10/2/20, at 129 (Detective Serfass's testimony on this point at the suppression hearing); *accord* N.T., 3/25/22, at 89 (Mertz testifying at trial that the number he gave C.B. was a "Google phone number" associated with his work phone).  Mertz does not specify just which evidence was allegedly illegally obtained from his personal cell phone.  In any event, his argument merits no relief for the reasons above.

[7] Mertz does not argue on appeal that the Commonwealth illegally searched his duffel bag prior to the issuance of a search warrant, but rather confines his argument to the seizure of the bag.  *See generally* Mertz's Brief at 30-38.  Thus, Mertz has waived this argument.  *See Commonwealth v. Reed*, 990 A.2d 1158, 1163 (Pa. 2010) (stating that "in the absence of a developed argument concerning the suppression ruling, no relief is available . . ..").  However, even if, *arguendo*, the trial court erred in denying Mertz's suppression motion relative to the bag because of an illegal seizure or search, the error was harmless.  The evidence found in the bag was condoms.  *See* N.T., 10/2/20, at 49.  There is no dispute that Mertz used a condom while he had sex with C.B.  *See* N.T., 3/23/22, at 49 (C.B. testifying that Mertz used a condom while he had sex with her); 3/25/22, at 79, 80-81 (Mertz testifying that he used a condom while he had sex with C.B. and that he keeps condoms in his bag).  Accordingly, the condoms seized from Mertz's bag are cumulative of the properly admitted testimony at trial that Mertz used a condom during intercourse with C.B. and that he kept condoms in his bag.  Therefore, any trial court error relating to this suppression ruling is harmless.  *See Jacoby*, 170 A.3d at 1085–86 (harmless error where erroneously admitted evidence is cumulative of properly admitted untainted evidence).

condoms), because the warrant was stale. This Court has set forth the applicable law regarding staleness as follows:

> Settled Pennsylvania law establishes that stale information cannot provide probable cause in support of a warrant. . . .
>
> [A]ge of the information supporting a warrant application is a factor in determining probable cause. If too old, the information is stale, and probable cause may no longer exist. Age alone, however, does not determine staleness. The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant. Rather, **we must also examine the nature of the crime and the type of evidence.**

**Commonwealth v. Hoppert**, 39 A.3d 358, 363 (Pa. Super. 2012) (internal citations, quotations, and indentation omitted; emphasis in original). Additionally, information sufficient for officers to reasonably believe that contraband would continue to be present at the suspected location precludes a finding of staleness. **See**, **e.g.**, **Commonwealth v. Alewine**, 558 A.2d 542, 544-45 (Pa. Super. 1989) (holding that a warrant was not stale after twenty-one days where officers reasonably believed the contraband, *i.e.*, video poker machines, would continue to be present at a restaurant/bar).

Mertz argues the trial court erred in denying his suppression motion because the warrant for his bag was stale. Mertz maintains his bag had been (unknowingly) in custody of PMRPD since late October 2019; however, police did not apply for a warrant until mid-January 2020. **See** Mertz's Brief at 46. Mertz elaborates: "All the information contained in the warrant application [i]n January [] 2020 was available to the Commonwealth [i]n October [] 2019 and

was not acted upon in a timely fashion." *Id*. at 47. Because the information was months old and there was no evidence of a "continuing nature to [his] . . . criminal activity," the warrant was stale. *Id*.

The trial court considered this issue and concluded it merited no relief:

> As far as the evidence can show, the bag sat undisturbed between October[] 2019 and January[] 2020. Evidence suspected to be found in the bag consists of physical objects, which would not dissipate or decay in months. If [Mertz's] bag contained evidence when it was left under the desk in October[] 2019, we have no reason to believe evidence would cease to exist by January[] 2020. In total, the facts that supported probable cause for the warrant issued [in] October [] 2019 to search [Mertz's] phone would have supported a warrant to search this bag at the same time. The time that then elapsed before January [] 2020 would not dissipate that probable cause.

Trial Court Opinion, 3/17/21, at 17.

Following our review, we discern no error in the trial court's ruling. As noted above, the essence of a staleness challenge is an assertion that probable cause no longer exists because the information in the warrant is too old. *See* ***Hoppert***, 39 A.3d at 363. But where there is reason to believe, based on the circumstances and nature of the evidence, that contraband will still be found, age alone does not require a finding of staleness. ***See Alewine***, 558 A.2d at 544-45. Apart from speculation, without evidence, about what may have happened to the bag in the interim between when Mertz last possessed the bag and when officers searched it, Mertz provides no basis above and beyond the age of the information in support of his staleness argument. However, given the nature of the evidence (condoms) and the fact that it is reasonable

for police to believe condoms would remain in an apparently forgotten and undisturbed bag for two months, the trial court did not commit legal error in determining the information in the warrant was not stale.[8]

In his third and fourth issues, Mertz argues the trial court erred in denying his suppression motion based on a broken chain of custody of the duty bag.[9] Gaps in the chain of custody go to the weight to be afforded evidence, not its admissibility. *See Copenhefer*, 719 A.2d 242, 256 (Pa. 1998).[10] Similarly, the remedy for a broken chain of custody is not suppression. *See id*. Additionally, "[a] complete chain of custody is not required so long as the Commonwealth's evidence, direct and circumstantial, establishes a reasonable inference that the identity and condition of the exhibits have remained the same from the time they were first received until the time of trial." *Commonwealth v. Cugnini*, 452 A.2d 1064, 1065 (Pa. Super. 1982).

---

[8] We additionally note that even if the trial court erred in its staleness determination, the error would be harmless for the reasons stated above. *See supra* note 7.

[9] Though it is delineated in the statement of questions involved portion of Mertz's brief as a separate issue, Mertz does not include in the argument section of his brief a separate section for his prosecutorial misconduct issue, but rather argues for it under the chain of custody subheading. *See* Mertz's Brief at 48-50. Accordingly, we address it in this section of the memorandum.

[10] Our standard of review for the admission of evidence is abuse of discretion. *See Commonwealth v. Feliciano*, 67 A.3d 19, 27 (Pa. Super. 2013).

Essentially, Mertz maintains the police officers engaged in misconduct by inadvertently holding onto his bag for several months and then improperly securing it prior to applying for a search warrant. He imputes this misconduct to the Commonwealth and asserts it also constitutes prosecutorial misconduct. Based on this asserted misconduct, Mertz argues the proper remedy is suppression. *See* Mertz's Brief at 47-53.

The trial court considered Mertz's issue and determined it merits no relief:

> [Mertz] declares that the Commonwealth engaged in misconduct by creating gaps in the bag's chain of custody. These gaps concern the time while the bag was in the Commonwealth's possession before being secured into custody as evidence. Although gaps and other defects in the chain of custody normally go to the weight and not admissibility of evidence, he seeks suppression by claiming the alleged misconduct is so grievous it requires the exclusionary rule.
>
> * * * *
>
> The failure to secure the bag amounts, at most, to a negligent failure to preserve evidence of possible tampering with the bag. With regard to information about who had access to the bag and whether its contents remained precisely the same until the time of seizure — which the Commonwealth "lost" by not securing the bag at the earliest feasible time — we find that information only "potentially useful." No suggestion that anything actually happened to the bag appears from the record, and [Mertz] provides no reason to believe evidence tampering occurred. As any exculpatory value has not been proven, we can only suppress this evidence if [Mertz] proves bad faith by the Commonwealth.
>
> We have no evidence of bad faith here. At most, this issue resulted from oversight or confusion, and the Commonwealth has not breached [Mertz's] constitutional rights. Neither have we

found evidence of bad faith or substantial prejudice to [Mertz], as we discussed above. We therefore determine that no basis for the exclusionary rule applies.

Trial Court Opinion, 3/17/21, at 18, 21.

Following our review, we again conclude the trial court's findings of fact are supported by the record and its conclusions of law error-free. Initially, we note that defects in the chain of custody go toward the weight of the evidence, not its admissibility or whether it should be suppressed. *See*, *e.g.*, *Copenhefer*, 719 A.2d at 256. Mertz's issue fails for this reason alone.[11] Moreover, we note that the law does not necessarily require a complete chain of custody, but rather that the Commonwealth's evidence establish a "reasonable inference that the identity and condition of the [evidence] remained the same . . . ." *Cugnini*, 452 A.2d at 1065. Mertz has speculated about how the bag might have been altered in the time between when he last possessed it and when police searched it pursuant to a warrant; however, the

---

[11] In support of his suppression argument, Mertz combines claims of prosecutorial misconduct (for which the remedy is a new trial or dismissal of the charges) with police misconduct (the remedy for which may be suppression). *See* Mertz's Brief at 49-50; *but cf*. *Commonwealth v. Edwards*, 272 A.3d 954, 973 (Pa. 2022) (discussing whether the appropriate remedy for prosecutorial misconduct is retrial or dismissal and concluding that the remedy depends on the egregiousness of the error); *Commonwealth v. Katona*, 240 A.3d 463, 478 (Pa. 2020) (suppression may be appropriate for evidence resulting from police misconduct). In any event, the trial court concluded no misconduct occurred, but instead, the chain of custody issue resulted from "oversight or confusion," or, "at most" negligence. *See* Trial Court Opinion, 3/17/21, at 21. We decline to disturb the trial court's findings of fact.

trial court found, and the record supports its finding, that nothing "actually happened" to the bag.  For this reason—and while Mertz has failed to develop a chain of custody challenge to the **admission** of this evidence—we note that the chain of custody claim, even if presented properly as a challenge to an evidentiary ruling, would merit no relief.[12]

In his fifth issue, Mertz argues the trial court erred in denying his motion to dismiss the charges based on a violation of **Brady**.  This Court has set forth the relevant law as follows:

> Rulings on allegations of discovery violations are reviewed under an abuse of discretion standard.  When considering a **Brady** claim in this regard, we must bear in mind the following:
>
> A **Brady** violation comprises three elements: 1) suppression by the prosecution 2) of evidence, whether exculpatory or impeaching, favorable to the defendant, and 3) to the prejudice of the defendant.  Furthermore, when the Commonwealth fails to preserve evidence that is potentially useful, there is no . . . due process violation unless a criminal defendant can show bad faith on the part of the police.

**Commonwealth v. Donoughe**, 243 A.3d 980, 984–85 (Pa. Super. 2020) (internal citations, quotations, brackets, and indentation omitted).

Mertz first argues that the Commonwealth committed a **Brady** violation by not turning over a statement Mertz made during his **Weingarten** meeting. **See** Mertz's Brief at 21.  Mertz asserts generally, without elaboration, that his

---

[12] In any event, even if the trial court erred in denying Mertz's motion to suppress the bag and its contents based on Mertz's chain of custody argument, and the misconduct claims predicated on it, this would be harmless error for the reasons stated above.  **See supra** note 7.

statement at the *Weingarten* meeting was both exculpatory and impeaching. *See id*. at 23. Mertz also alleges a *Brady* violation because the Commonwealth has not provided him "a statement by an alleged confidential informant [] which the Commonwealth *attempted to elicit* during its case in chief," which was not admitted into evidence, but which the Commonwealth sought to introduce for the purpose of showing the course of the investigation. *See id*. at 24 (emphasis added); *see also* N.T., 3/24/22, at 129-35.

Following our review, we conclude Mertz's issue merits no relief. Instantly, the trial court explained that it held a hearing in September 2022 at which PMRPD Lieutenant Vogt and Chief Wagner testified that they provided no information from the *Weingarten* hearing to the prosecution. *See* Trial Court Opinion, 11/23/22, at 7; *see also* N.T., 9/3/22, at 25-26, 38-39. Moreover, Mertz has failed to show how the recording or transcript from his *Weingarten* hearing was favorable to him. Regarding the confidential informant—and as the trial court explained—Mertz has similarly failed to show how this evidence was favorable to him. *See* Trial Court Opinion, 11/23/22, at 9. For these reasons, he is due no relief. *See Donoughe*, 243 A.3d at 984-85 (requiring, for a *Brady* violation, a showing that the allegedly suppressed evidence would have been favorable to the defense).[13]

---

[13] While Mertz does not develop his discovery issue separately from his *Brady* argument, and has arguably waived this aspect of his issue, *see Commonwealth v. Snyder*, 870 A.2d 336, 342 (Pa. Super. 2005) (noting
*(Footnote Continued Next Page)*

In his sixth issue, Mertz argues the trial court made several erroneous evidentiary rulings, and declined a requested jury instruction, which deprived him of a fair trial and requires reversal. Our standard of review of evidentiary issues is as follows:

> The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

***Commonwealth v. Hernandez***, 39 A.3d 406, 411 (Pa. Super. 2012). Further, "we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law. Thus[,] our standard of review is very narrow. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." ***Commonwealth v. Lopez***, 57 A.3d 74, 81 (Pa. Super. 2012) (internal citation omitted).

_____

that "[u]ndeveloped claims are waived"), we note that even if there were a discovery violation, our Rules of Criminal Procedure set forth the appropriate remedy: "[T]he court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances." Pa.R.Crim.P. 573(E). Neither Mertz's statements from the hearing nor the information from the CI was used or introduced at Mertz's trial, which, assuming a violation of the discovery rules set forth in Rule 573, is consistent with the remedies Rule 573(E) provides (*i.e.*, preclusion at trial of the undisclosed evidence).

For jury instructions, our standard of review is well-settled: "[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." ***Commonwealth v. Green***, 273 A.3d 1080, 1084 (Pa. Super. 2022), *appeal denied*, 289 A.3d 522 (Pa. 2022). Further, "[t]the trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the [a]ppellant was prejudiced by that refusal." ***See id***. (internal citation omitted).

We must first determine whether Mertz properly preserved his issues. Undeveloped arguments are waived. ***See Commonwealth v. Perez***, 93 A.3d 829, 838 (Pa. 2014) (holding that "to the extent appellant's claims fail to contain developed argument or citation to supporting authorities and the record, they are waived"). With this principle in mind, we note the following: Mertz asserts the trial court erred in its rulings relating to "the testimony of MDJ Germano," "regarding the admission of hearsay through Officer Vogt," about "presenting 'anti-motive' evidence to the jury," and by restricting the "testimony of Sarah Mertz." Mertz's Brief at 25. Mertz additionally asserts that the court should have permitted a "delayed report" jury instruction because C.B. had not intended to report the matter at all; the trial court should have permitted an impossibility defense; and the court should have given a "reverse consciousness of guilt" jury instruction. ***See id***. at 28-30. However,

Mertz has developed no argument about the following: MDJ Germano's testimony, alleged hearsay introduced via Officer Vogt, or restrictions on the testimony of Sarah Mertz. *See* Mertz's Brief at 25-30. Mertz has thereby waived these issues.[14]

We next address Mertz's preserved evidentiary arguments. Mertz first argues that the trial court erred in precluding his "anti-motive" evidence, namely, evidence that, as a police officer, he was aware of the consequences of his criminal conduct and thus was less likely to have committed the offenses. *See* Mertz's Brief at 27.

The trial court concluded this issue merits no relief:

[Mertz] has failed to address or cite to any case law either in the Commonwealth or across the nation where this style of "anti-motive" evidence is permissi[ble,] nor have we been able to locate any. . . . We are not required to give every charge requested by the parties, and we find that there was no prejudice to [Mertz] or error in failing to instruct the jury on anti-motive evidence.

Trial Court Opinion, 11/23/22, at 10-11.[15]

_____

[14] We further observe that Mertz also raises as part of this issue his "impossibility defense." However, as Mertz notes, he addresses the issue as a separate question in his brief. *See* Mertz's Brief at 29. Accordingly, we address impossibility in Mertz's next issue.

[15] At trial, the Commonwealth objected to Mertz's "anti-motive" evidence based on the fact that "[t]here's no Pennsylvania authority that would support [Mertz's] assertions that he's allowed to get into that line of inquiry. And, logically, it doesn't even make sense because a layperson knows they can get in trouble . . .." N.T., 3/25/22, at 110.

We discern no abuse of discretion by the trial court. We note that the trial court allowed Mertz to testify generally that he was aware "there could be departmental consequences" for having sex with C.B. while on duty, *see* N.T., 3/25/22, at 113; however, Mertz denied he had committed a crime, and further stated he was unaware there could be criminal consequences "[b]ecause I didn't do anything wrong. I mean, an affair." *See id*. Mertz now suggests he should have been permitted to testify more specifically to consequences "associated with criminal behavior" including his "personal knowledge of the consequences in terms of loss of pension and the like." *Id*. Yet, by his own testimony, Mertz was unaware of any criminal consequences at the time; and, additionally, he did testify that he was aware of the professional consequences. *See id*. Mertz fails to show now that the trial court abused its discretion or prejudiced him to the extent that a new trial is required simply because it did not let him testify to the myriad of possible consequences he might have considered at the time he had sex with C.B.[16]

_____

[16] As part of this issue, Mertz also maintains the trial court should have issued a "reverse" consciousness of guilt instruction. He argues this instruction is "in some respects [] a bedfellow to anti-motive evidence." *See* Mertz's Brief at 29. The trial court noted that it "is not aware of any case where such an instruction was given." *See* Trial Court Opinion, 11/23/22, at 12. Mertz's brief contains no intelligible argument in this respect; it does not contain citations to cases where such an instruction was given; and it fails to show how the trial court abused its discretion or erred as a matter of law. *See* Mertz's Brief at 29-30; *cf*. *Green*, 273 A.3d at 1084 (providing that our standard of review is abuse of discretion/error of law and that a defendant needs to show prejudice). Thus, we find Mertz's argument about the reverse

*(Footnote Continued Next Page)*

Mertz next argues the trial court should have given a "delayed report instruction." *See* Mertz's Brief at 28. This Court has set forth the law on prompt complaint instructions as follows:

> The prompt complaint instruction is based upon a belief that a victim of a violent assault would reveal the assault occurred at the first available opportunity. *. . .* [T]he purpose of the instruction is to allow a jury to call into question a complainant's credibility when he or she did not complain at the first available opportunity.
>
> The propriety of a prompt complaint instruction is determined on a case-by-case basis pursuant to a subjective standard based upon the age and condition of the victim. For example, where the victim of a sexual assault is a minor who may not have appreciated the offensive nature of the conduct, the lack of a prompt complaint would not necessarily justify an inference of fabrication. This is especially true where the perpetrator is one with authority or custodial control over the victim. Similarly, if the victim suffers from a mental disability or diminished capacity, a prompt complaint instruction may not be appropriate.

*Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006) (internal citations and quotations omitted).

Here, the trial court considered Mertz's argument for a prompt complaint instruction and denied it, concluding "I just don't think the facts support it; and for that reason, I'm not going to instruct on that." N.T., 3/28/22, at 102.

Based on our review, we discern no abuse of discretion. We note that C.B. did promptly report the incident: Right after C.B. got home, within

---

consciousness of guilt instruction undeveloped, which hinders our review, and it is therefore waived. *See Perez*, 93 A.3d at 838 (undeveloped claims are waived).

approximately the same hour, she texted her friend, Wolbert, about the incident, and asked how to proceed. ***See***, ***e.g.***, N.T., 3/23/22, at 54; ***see also id***. at 113.[17] We further note that the trial court instructed the jury about credibility determinations. ***See*** N.T., 3/28/22, at 106-08; ***accord Commonwealth v. Thomas***, 904 A.2d 964, 971 (Pa. Super. 2006) (concluding there was no error in the omission of a prompt complaint instruction under similar circumstances). Thus, Mertz's prompt complaint issue merits no relief.

In his seventh issue, Mertz argues the trial court erred in denying his motion to dismiss because he had a meritorious impossibility defense. Mertz next argues that the trial court erred in denying his motion to dismiss based on the fact that it was impossible for him to complete his crime because he was discharged, but, notwithstanding his discharge, "[c]harges could still be filed to this day [against C.B.] since the statute of limitations has not expired." Mertz's Brief at 55. Because C.B. could still have been charged after Mertz was discharged, he reasons that he could not have completed the crime, namely, precluding the filing of charges against C.B. in exchange for consideration. ***See id***.

---

[17] Mertz appears to conflate the fact that C.B. did not intend to report the matter to police with the fact that she actually reported it to her friend just after the incident. ***See*** Mertz's Brief at 28 (Mertz arguing the "delayed report" instruction was required because C.B. "did not intend to report the matter at all") (emphasis omitted).

Before reviewing the merits of this issue, we must determine whether Mertz has properly preserved it. "The Rules of Appellate Procedure require appellants to support their arguments with pertinent discussion and citation to authority." *Commonwealth v. Wholaver*, 177 A.3d 136, 160 (Pa. 2018) (citing Pa.R.A.P. 2119(a)). Where an appellant fails to "to cite relevant case law, develop his legal argument, or apply the law to the facts of the case regarding this contention, it is waived." *Commonwealth v. Bradley*, 232 A.3d 747, 756 (Pa. Super. 2020) (internal citation omitted).

Here, we observe that Mertz has failed to include any legal citations, either to statutes or case law, and has thus failed to include, discuss, and apply pertinent authority. *See* Mertz's Brief at 53-55. Accordingly, he has waived this issue. *See Wholaver*, 177 A.3d at 160-61; *see also Bradley*, 232 A.3d at 756.[18]

---

[18] Even if not waived, Mertz's issue would merit no relief. As the trial court astutely pointed out, bribery occurs when a person "offers, confers or agrees to confer upon another, or solicits, *accepts or agrees to accept from another* . . . *any benefit as consideration for a violation of known legal duty as public servant or party official*." *See* 18 Pa.C.S.A. § 4701(a)(3) (emphasis added). Obstruction includes "*intentional, albeit unsuccessful, attempts to* influence, obstruct, or *delay the administration of law*." *Commonwealth v. Gentile*, 640 A.2d 1309, 1312 (Pa. Super. 1994) (applying 18 Pa.C.S.A. § 5101) (emphasis added). *See also Commonwealth v. Snyder*, 60 A.3d 165, 177 (Pa. Super. 2013) (holding the same). Evidence of record shows that Mertz committed the offense of bribery by agreeing to accept from C.B. oral and vaginal sex as consideration for a violation of his duty, *i.e.*, by either not filing or delaying the filing of criminal charges for her DUI, and that he intentionally, albeit unsuccessfully, attempted to delay the administration of law (as evinced by his text messages

*(Footnote Continued Next Page)*

In his eighth issue, Mertz argues the trial court abused its discretion in sentencing him outside of the guidelines without adequate reasons. Our standard of review for challenges to the discretionary aspects of sentencing is well-settled: "[S]entencing is vested in the discretion of the trial court, and will not be disturbed absent a manifest abuse of that discretion[, which] involves a sentence which was manifestly unreasonable, or which resulted from partiality, prejudice, bias or ill will. It is more than just an error in judgment." *Commonwealth v. Brown*, 249 A.3d 1206, 1211 (Pa. Super. 2021).

Further, this Court has explained that challenges to the discretionary aspects of sentencing are not appealable as of right, but, rather,

> an appellant challenging the sentencing court's discretion must invoke this Court's jurisdiction by (1) filing a timely notice of appeal; (2) properly preserving the issue at sentencing or in a motion to reconsider and modify the sentence; (3) complying with Pa.R.A.P. 2119(f), which requires a separate section of the brief setting forth "a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a

---

to C.B. reassuring her she would not be charged with DUI; his failure to fingerprint her; and his message informing her that he could lose the report detailing the incident since he had not had her fingerprinted). *See* N.T., 3/25/22, at 102 (Mertz admitting that he had said to C.B., "I do my report and it gets lost among all my other reports. As long as I didn't get you fingerprinted, which I didn't, it's all good"); *accord* Trial Court Opinion, 4/16/21, at 22 (concluding that neither offense "require[s] satisfaction of the proposal or agreement. As proof of the same is not essential to the charges, the possibility of performance is not a material element. Proof of impossibility therefore cannot negate a material element"). Thus, the evidence shows that the offenses were far from being impossible; rather, Mertz's conduct met the elements of the offense notwithstanding the fact that he may have been ultimately unsuccessful in making the charges against C.B. disappear.

sentence[;]" and (4) presenting a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

***Commonwealth v. Padilla-Vargas***, 204 A.3d 971, 975 (Pa. Super. 2019) (citation omitted; brackets in original); ***see also*** 42 Pa.C.S.A. § 9781(b).

Regarding the requirement that an appellant raise a "substantial question," this Court has explained:

A substantial question exists where an appellant sets forth a plausible argument that the sentence violates a particular provision of the Sentencing Code or is contrary to the fundamental norms underlying the sentencing process.

***Brown***, 249 A.3d at 1211 (internal citation omitted). "The determination of whether a particular issue raises a substantial question is to be evaluated on a case-by-case basis." ***Commonwealth v. McAfee***, 849 A.2d 270, 274 (Pa. Super. 2004). An assertion that " the sentencing judge sentenced outside the guidelines without reflecting a consideration of the guidelines, and that the sentencing judge failed to state adequate reasons on the record for sentencing outside the guidelines" presents a substantial question. ***Commonwealth v. Johnson***, 666 A.2d 690, 692 (Pa. Super. 1995).

Here, Mertz timely appealed following the denial of his post-sentence motion; he asserted in his post-sentence motion and at the hearing on the motion that the trial court imposed a sentence outside of the guidelines without adequate reasons, ***see***, ***e.g.***, Motion for Reconsideration, 6/30/22, at ¶¶ 1-3, and he included a separate Rule 2119(f) statement in his brief. ***See*** Mertz's Brief at 10-12. Mertz's assertion that the trial court sentenced him

outside of the guidelines without adequate reasons raises a substantial question. **See Johnson**, 666 A.2d at 692. Therefore, we proceed to review Mertz's issue on the merits.

Mertz argues the trial court abused its discretion in sentencing him outside of the guidelines without stating adequate reasons. This Court has set forth the following standards for when a trial court sentences outside of the guidelines:

> In sentencing outside the guidelines, the sentencing judge must follow the mandate of § 9721(b) of the Sentencing Code, 42 Pa.C.S.[A.] § 9701 *et seq.,* which provides in pertinent part: In every case where the court imposes a sentence outside the sentencing guidelines adopted by the Pennsylvania Commission on Sentencing . . . the court shall provide a contemporaneous written statement of the reason or reasons for the deviation from the guidelines. Failure to comply shall be grounds for vacating the sentence and re-sentencing the defendant . . ..
>
> The statute requires a trial judge who intends to sentence a defendant outside the guidelines to demonstrate on the record, as a proper starting point, his awareness of the sentencing guidelines. Having done so, the sentencing court may deviate from the guidelines, if necessary, to fashion a sentence which takes into account [section 9721(b)'s required factors, namely,] the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to the impact on the life of the victim and the community, so long as he also states of record the factual basis and specific reasons which compelled him to deviate from the guideline range.

**Commonwealth v. Eby**, 784 A.2d 204, 206 (Pa. Super. 2001) (internal citations, quotations, and indentation omitted). Additionally, "[a] sentence that disproportionally punishes a defendant in excess of what is necessary to achieve consistency with the section 9721(b) factors violates the express

terms of 42 Pa.C.S.[A.] § 9721(b), as would a sentence that is disproportionately lenient." ***Commonwealth v. Williams***, 69 A.3d 735, 742 (Pa. Super. 2013). Further,

> [w]hen evaluating a claim of this type, it is necessary to remember that the sentencing guidelines are advisory only. If the sentencing court deems it appropriate to sentence outside the guidelines, it may do so as long as it offers reasons. Our Supreme Court has indicated that if the sentencing court proffers reasons indicating that its decision to depart from the guidelines is not unreasonable, we must affirm a sentence that falls outside those guidelines . . .. [I]n exercising its discretion, the trial court must consider the character of the defendant and the particular circumstances of the offense, and must impose a sentence that is consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant.

***Id***. at 206–07 (internal citations, quotations, italics, and brackets omitted).

However, and crucially, this Court has explained that the "primary purpose" of the sentencing guidelines is:

> [T]o create a system where not only would offenders be properly punished for their transgressions, but also where like offenders would be treated consistently. *. . .*
>
> The sentencing guidelines were formulated in order to weave rationality out of an all-too chaotic sentencing system wherein sentences sometimes varied widely from one county to the next, and even from one courtroom to the next in the same county.

***Id***. at 208 (internal citations and quotations omitted).

> Thus:
>
> To promote the above objectives the sentencing code/guidelines take into consideration the severity or gravity of the offense initially by imposing increasingly greater sentences for increasingly egregious conduct. To wit, an aggravated assault is subject to greater punishment than a simple assault and a rape is

subject to greater punishment than a theft offense. Thus, given any particular offense, the guidelines provide the predesignated ranges of punishment for the offense considering the inherent egregiousness of the conduct which is generally associated with the commission of that offense. . . .

However, recognizing that certain cases of a particular crime may vary from the typical case or may have attendant factors calling for a greater or lesser sentence, the guidelines also provide aggravated and mitigated ranges. Thus, when a case is not of the norm the sentencing judge may deviate from the standard sentencing range. However, when sentencing in these ranges, the court is required to provide reasons for so doing. Implicit in this methodology is the premise that the court must have valid reasons for sentencing in these ranges, otherwise the recitation of the reasons on the record would serve no real purpose. ***Further implicit in this methodology is the premise that the court's sentence in light of its reasons is subject to review by the appellate courts. To hold otherwise is to relegate the guidelines scheme to a purely voluntary practice, for sentencing courts could simply pay token lip service to the guidelines and then impose any sentence they wished within the legal limitations without any forms of checks and balances***.

*Id*. at 208-09 (emphasis added). Stated succinctly: "[T]he use of the guidelines is not voluntary. Courts must apply the guidelines unless the circumstances of the individual case require deviation, and in that situation where deviation is required the court must articulate sufficient reasons to justify this conclusion." *Id*. at 209. A sentence may be unreasonable because it is "patently disproportionate and excessive even given the assumption that the trial court's weighing of factors was reasonable." ***Williams***, 69 A.3d at 744.

Lastly, as this Court has explained, "[w]hen reviewing a sentence outside of the guideline range, the essential question is whether the sentence

imposed was reasonable. An appellate court must vacate and remand a case where it finds that the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable. [*See*] 42 Pa.C.S.A. § 9781(c)(3)." ***Commonwealth v. Sheller***, 961 A.2d 187, 190 (Pa. Super. 2008) (internal citation and quotations omitted). In making a reasonableness determination, a court should consider four factors:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant.
>
> (2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.
>
> (3) The findings upon which the sentence was based.
>
> (4) The guidelines promulgated by the commission.

42 Pa.C.S.A. § 9781(d). A sentence may be found unreasonable if it fails to properly account for these four statutory factors. ***See Sheller***, 961 A.2d at 191. "An appellate court must vacate and remand a case where it finds that the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable." ***Id***. at 190 (citing 42 Pa.C.S.A. § 9781(c)(3)) (internal quotations omitted).

Mertz argues the trial court abused its discretion by imposing a thirty-to-sixty-month sentence of imprisonment. The guidelines indicated a standard-range term of restorative sanctions to nine months of incarceration for bribery and restorative sanctions to one month of incarceration for obstruction of justice. ***See*** Mertz's Brief at 17. For Mertz, bribery carried an

aggravated range of up to twelve months, and obstruction carried an aggravated range of up to four months. *See id*. Mertz observes that his sentence is two-and-a-half times the aggravated range for bribery and over three times the top of the standard range. *See id*. at 19. Mertz essentially argues the trial court did not state adequate reasons for exceeding the aggravated range. *See id*.

The trial court considered Mertz's argument and concluded it merits no relief:

> In the present case, this court considered the sentencing guidelines, the presentence investigation [report] ("PSI"), [Mertz's] character, including his lack of remorse and imposed an appropriate sentence under the circumstances. Moreover, we set forth at the time of sentencing our reasons for imposing an upward departure sentence, including [Mertz's] lack of remorse for his conduct, his reference to the incident as a "mistake" where he assumes no responsibility towards the victim; the impact on the victim; and the impact on the wider community. The [c]ourt noted that as a police officer, [Mertz] was sworn to uphold the law, and he did not. Instead he took advantage of a 26[-]year[-]old young woman, who was under the influence of alcohol, by claiming that he would take care of the DUI charges in exchange for sex, but never intended to do so. At the time, [Mertz] was in his mid-fifties and a 22[-]year veteran of the police department. In addition, [Mertz's] crimes tarnished the reputation of every officer in the community, as was so poignantly set forth by PMRPD Chief Wagner at the time of sentencing. In sum, he noted that a fall from grace by a police officer affects many officers. . . .
>
> While [Mertz] alleges that bribery and obstruction are victimless crimes, we disagree. We find that C.B is a victim. The crimes for which [Mertz] was convicted have a vast impact on society as a whole, especially where [Mertz] was an on-duty police officer. This court is free to weigh each aggravating and mitigating circumstance within our sound discretion. . . .

Trial Court Opinion, 11/22/23, at 3-4.

Following our review, we conclude the trial court abused its discretion insofar as it sentenced outside even the aggravated range of the guidelines such that Mertz received a sentence for bribery that was two-and-a-half times the top of the aggravated range. *See* Guidelines, 11/29/22 (providing for a standard range of "RS-9" and aggravated range of up to "12" months for the bribery conviction). As this Court has explained, and we reiterate, the sentencing guidelines are not "a purely voluntary practice, for sentencing courts could simply pay token lip service to the guidelines and then impose any sentence they wished within the legal limitations without any forms of checks and balances." *Eby*, 784 A.2d at 209 (internal citation omitted). While the trial court placed its reasons on the record for its sentence, and it explained why it determined an aggravated range sentence was appropriate, nowhere did the trial court explain why a sentence of over twice the aggravated range was reasonable and appropriate. We further observe that while the trial court purported to consider Mertz's mitigating evidence— including his responsibility to care for his disabled wife, whom the trial court had "no doubt that she requires significant care"; his lack of prior criminal history; and his medical conditions including a recent stroke, *see* N.T., 6/28/22, at 46—the trial court declined to mention, let alone consider them, in its subsequent opinion in support of its judgment of sentence. *See* Trial Court Opinion, 11/23/22, at 4.

Our review reveals that a majority of the section 9781(d) considerations militate in favor of resentencing: while the trial court considered the nature and circumstances of the offense, and had the opportunity to observe Mertz and consider a PSI, the trial court did not give adequate consideration to the history and characteristics of the defendant (specifically his mitigating evidence, including his lack of criminal history), it did not sufficiently articulate the findings upon which the sentence—in excess of two times the aggravated range—was based, and it sentenced well outside of the guidelines. *Cf*. 42 Pa.C.S.A. § 9781(d)(1)-(4). Further, even assuming the trial court reasonably weighed the section 9721(b) factors, its sentence was "patently disproportionate and excessive." *See Williams*, 69 A.3d at 744. Accordingly, we conclude the trial court's sentence was unreasonable, and, therefore, it abused its discretion.[19] Thus, we vacate and remand for resentencing. *See*

_____

[19] To the extent Mertz argues the court should not have allowed C.B. to make a victim impact statement, *see* Mertz's Brief at 19-20, our Supreme Court has held that sentencing courts have discretion to hear impact statements from victims and indirect victims as members of the affected community. *See Commonwealth v. Ali*, 149 A.3d 29, 39 (Pa. 2016) (stating, "Of course, the sentencing court must take a measured approach to community and indirect victim effects depending upon the level of attenuation between the crime and the proffered impact"). The trial court committed no error in permitting C.B. to make a victim impact statement. Based on our disposition, we need not reach Mertz's remaining arguments in support of his challenge to the discretionary aspects of his sentence.

*Sheller*, 961 A.2d at 190 (stating that this Court must vacate and remand where a sentence is outside of the guidelines and unreasonable).[20]

Convictions affirmed. Judgment of sentence vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date:  12/19/2023

---

[20] Because we vacate the judgment of sentence and remand for resentencing, we decline to reach Mertz's ninth assertion of error, *i.e.*, his bail issue. ***See***, ***e.g.***, ***Commonwealth v. Abed***, 989 A.2d 23, 29 (Pa. Super. 2010) (noting that the issue of bail becomes "technically moot" following sentencing); ***see also Commonwealth v. Myers***, 86 A.3d 286, 292-94 (Pa. Super. 2014) (concluding that the trial court erred in denying the appellant's motion for bail pending appeal, and that the remedy was a remand for a bail hearing). Upon remand in this case, the trial court may hold a bail hearing and thereafter make a bail determination pursuant to Pa.R.Crim.P. 521.